ORAL ARGUMENT NOT YET SCHEDULED
**Case No. 22-1097**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner.*

*v.*

UNITED STATES OF AMERICA,

*Respondent.*

---

On petition for review from a decision of the
Court of Military Commission Review

---

**Brief for Petitioner**

---

MAJ Todd E. Pierce, JA, USA (Ret.)
Univ. of Minnesota Human Rights
Center Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

Michel Paradis
LT Jennifer Joseph, JAGC, USN
Aaron Shepard
Military Commission Defense
Organization
1620 Defense Pentagon
Washington, DC 20301-1620
michel.d.paradis.civ@mail.mil
1.703.695.4672

*Counsel for Petitioner*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**I.      PARTIES AND *AMICI* APPEARING BELOW**

The parties and *amici* who appeared before the Court of Military Commission Review in connection with the decision under review:

    1.  Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

    2.  United States of America, *Appellee*

**II.     PARTIES AND *AMICI* APPEARING IN THIS COURT**

    1.  Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

    2.  United States of America, *Respondent*

**III.    RULINGS UNDER REVIEW**

This case arises from a timely petition for review of the decision of the Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 21-003 (May 17, 2022). That decision was reported at 2022 WL 2977377.

**IV.     RELATED CASES**

Petitioner previously filed petitions for review in this Court from decisions of the CMCR, which this Court docketed as Case Nos. 11-1325 and 19-1076 respectively and which both resulted in remands back to the CMCR. While considering Case Nos. 11-1325 and 19-1076, this Court issued five decisions which were reported at 2013 WL 297726, 767 F.3d 1, 792 F.3d 1, 840 F.3d 757, and 967 F.3d 858. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: November 14, 2022

                       By: /s/ Michel Paradis
                            Counsel for Petitioner

# TABLE OF CONTENTS

**Certificate as to Parties, Rulings and Related Cases**............................................ i

**Table of Authorities**.................................................................. iv

**Glossary of Terms**.................................................................. xi

**Jurisdictional Statement** ........................................................... 1

**Questions Presented** ............................................................... 1

**Standards of Review**............................................................... 2

**Summary of Argument** ............................................................ 3

**Statement of Facts** ................................................................ 8

**Argument**........................................................................ 24

    I.    Petitioner's military commission lacked jurisdiction because the Convening Authority was not a principal officer. ........................................... 24

        A.    *Arthrex* compels this Court to reassure itself of jurisdiction. .................................................................... 24

        B.    The Convening Authority is an agency head with the discretion to make unreviewable final decisions that bind the United States. ......................................................... 26

        C.    Under *Arthrex*, the Convening Authority must be a principal officer. ...................................................... 31

    II.    Resentencing is required to ensure that Petitioner is not sentenced on the basis of evidence obtained by torture. ............................ 34

    III.    The CMCR abused its discretion in denying resentencing. .................... 39

        A.    The CMCR applied the wrong burden of proof. ................................ 41

        B.    Given the state of the record, resentencing is required........................ 42

IV.   Even assuming the CMCR could reliably reassess Petitioner's sentence for harmlessness, it abused its discretion in affirming...................... 51

    A.   Uncorroborated custodial statements cannot establish any material fact beyond a reasonable doubt. ........................................... 53

    B.   The CMCR drew erroneous inferences from the record. ................... 54

    C.   The CMCR abused its discretion by reimagining the record to justify a sentence on legal theories not presented to the members. .................................................................................. 56

**Conclusion** ........................................................................................................ **58**

**Certificate of Compliance with Rule 32(a)** ...................................... **59**

**Certificate of Service** ................................................................................. **60**

**Addendum of Relevant Constitutional, Statutory & Regulatory Provisions** ........................................................................ **A-1**

    Constitutional Provisions .............................................................. A-1

    Statutes ........................................................................................... A-2

    Regulation for Trial by Military Commission ........................... A-11

    Manual for Military Commissions ............................................. A-20

# TABLE OF AUTHORITIES

*Petitioner places primary reliance on authorities marked with an ***

**Cases**

*Estelle v. Smith*,
    451 U.S. 454 (1981)....................................................................... 38

*Hicks v. Oklahoma*,
    447 U.S. 343 (1980)................................................................. 40, 45

*United States v. Arthrex*,
    141 S. Ct. 811 (2020)..................................... 1, 22, 26, 29, 31, 33

*United States v. Buber*,
    62 M.J. 476 (C.A.A.F. 2006) ......................................... 2, 6, 42, 51

*United States v. Kpodi*,
    824 F.3d 122 (D.C. Cir. 2016) ............................................... 54, 56

*United States v. Pinkney*,
    551 F.2d 1241 (D.C. Cir. 1976) ............................................. 41, 57

*United States v. Sales*,
    22 M.J. 305 (C.M.A. 1986)............................... 6, 23, 39, 42, 51

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ..................................................... 2

*Alwi v. Obama*,
    653 F.3d 11 (D.C. Cir. 2011) ........................................................ 53

*Al-Zahrani v. Rodriguez*,
    669 F.3d 315 (D.C. Cir. 2012) ..................................................... 24

*Am. Canoe Ass'n v. Murphy Farms*,
    326 F.3d 505 (4th Cir. 2003) ....................................................... 24

*Arizona v. Fulminante*,
    499 U.S. 279 (1991)........................................................................ 2

*Bahlul v. United States*,
    374 F. Supp. 3d 1250 (CMCR 2019)........................................... 22

*Bahlul v. United States*,
    792 F.3d 1 (D.C. Cir. 2015) ......................................................... 21

*Bahlul v. United States*,
    840 F.3d 757 (D.C. Cir. 2016) ...................................................................... 21

*Bahlul v. United States*,
    967 F.3d 858 (D.C. Cir. 2020) ........................................ 22, 25, 32, 33, 39, 42

*Bahlul v. United States*,
    No. 11-1324, 2013 WL 297726 (D.C. Cir., Jan. 25, 2013) ........................... 21

*Baker v. Spath*,
    2018 WL 3029140 (D.D.C., June 18, 2018) .................................................. 28

*Brady v. Maryland*,
    373 U.S. 83 (1963) ........................................................................................ 18

*Bronner v. Duggan*,
    962 F.3d 596 (D.C. Cir. 2020) ...................................................................... 24

*Bryant v. United States*,
    417 F.2d 555 (D.C. Cir. 1969) ...................................................................... 41

*Cannabis Therapeutics v. DEA*,
    15 F.3d 1131 (D.C. Cir. 1994) ...................................................................... 26

*Chapman v. California*,
    386 U.S. 18 (1976) ............................................................................. 6, 40, 47

*Clabourne v. Ryan*,
    745 F.3d 362 (9th Cir. 2014) ................................................................... 35, 38

*Demore v. Kim*,
    538 U.S. 510 (2003) ...................................................................................... 35

*Dorsey v. United States*,
    567 U.S. 260 (2012) ...................................................................................... 35

*Fahy v. Connecticut*,
    375 U.S. 85 (1963) ........................................................................................ 47

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ...................................................................................... 15

*Henderson v. United States*,
    568 U.S. 266 (2013) ...................................................................................... 34

*In re Al-Nashiri*,
    835 F.3d 110 (D.C. Cir. 2016) ...................................................................... 32

*In re Sealed Case*,
    552 F.3d 841 (2009) ................................................................................. 2, 56

*Jackson v. Denno*,
    378 U.S. 368 (1964)................................................................. 36, 37

*Koon v. United States*,
    518 U.S. 81 (1996)........................................................................ 2

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996)................................................... 24

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)............................................................... 21

*McClaughry v. Deming*,
    186 U.S. 49 (1902)..................................................................... 24

*McIntosh v. Department of Defense*,
    ___ F.4th ___, 2022 WL 16826178 (Fed. Cir., Nov. 9, 2022) ...... 30

*Mitchell v. United States*,
    526 U.S. 314 (1999)................................................................... 38

*Rita v. United States*,
    551 U.S. 338 (2007)................................................................... 46

*Smith v. United States*,
    348 U.S. 147 (1954)................................................................... 54

*Spano v. New York*,
    360 U.S. 315 (1959)................................................................... 37

*Sullivan v. Louisiana*,
    508 U.S. 275 (1993)................................................................... 47

*Townsend v. Burke*,
    334 U.S. 736 (1948)................................................................... 40

*United States v. Baird*,
    851 F.2d 376 (D.C. Cir. 1988)..................................................... 2

*United States v. Bennitt*,
    74 M.J. 125 (C.A.A.F. 2015)..................................................... 57

*United States v. Beverly*,
    34 C.M.R. 248 (CMA 1964)..................................................... 53

*United States v. Boone*,
    49 M.J. 187 (C.A.A.F. 1998)..................................................... 57

*United States v. Boyce*,
    76 M.J. 242 (C.A.A.F. 2017)..................................................... 31

*United States v. Bresnahan,*
   62 M.J. 137 (C.A.A.F. 2005) .......................................................... 2

*United States v. Bubonics,*
   45 M.J. 93 (C.A.A.F. 1996) ........................................................... 36

*United States v. Calley,*
   22 U.S.C.M.A. 534 (C.M.A. 1973) ............................................... 50

*United States v. Castillo-Torres,*
   8 F.4th 68 (1st Cir. 2021) .............................................................. 48

*United States v. Denedo,*
   556 U.S. 904 (2009) ...................................................................... 24

*United States v. Dickerson,*
   163 F.3d 639 (D.C. Cir. 1999) ................................................. 53, 54

*United States v. Diggs,*
   522 F.2d 1310 (D.C. Cir. 1975) .................................................... 41

*United States v. Dukes,*
   5 M.J. 71 (C.M.A. 1978) ............................................................... 44

*United States v. Garcia Sota,*
   948 F.3d 356 (D.C. Cir. 2020) ...................................................... 40

*United States v. Gerlich,*
   45 M.J. 309 (C.A.A.F. 1996) ......................................................... 31

*United States v. Ghailani,*
   743 F. Supp. 2d 261 (S.D.N.Y. 2010) .......................................... 35

*United States v. Gleason,*
   43 M.J. 69 (C.A.A.F. 1995) ........................................................... 57

*United States v. Graner,*
   69 M.J. 104 (C.A.A.F. 2010) ......................................................... 50

*United States v. Guardado,*
   77 M.J. 90 (C.A.A.F. 2017) ........................................................... 35

*United States v. Henry,*
   472 F.3d 910 (D.C. Cir. 2007) ...................................................... 44

*United States v. Khadr,*
   568 F.Supp.3d 1266 (CMCR 2021) .............................................. 30

*United States v. Lyons,*
   706 F.2d 321 (D.C. Cir. 1976) ...................................................... 41

vii

*United States v. Miller*,
    67 M.J. 385 (C.A.A.F. 2009) ........................................................ 57

*United States v. Moffeit*,
    63 M.J. 40 (C.A.A.F. 2006) ................................... 6, 41, 45, 49

*United States v. Moore*,
    540 F.2d 1088 (D.C. Cir. 1976) .................................................. 41

*United States v. Nerad*,
    69 M.J. 138 (C.A.A.F. 2010) ................................................ 31, 32

*United States v. Peoples*,
    29 M.J. 426 (C.M.A. 1990) ......................................................... 41

*United States v. Rhodes*,
    106 F.3d 371 (D.C. Cir. 1997) .................................................... 40

*United States v. Rust*,
    41 M.J. 472 (C.A.A.F. 1995) ....................................................... 47

*United States v. Tucker*,
    404 U.S. 443 (1972) .................................................................... 40

*United States v. Voorhees*,
    16 C.M.R. 83 (C.M.A. 1954) ...................................................... 41

*United States v. Whitten*,
    610 F.3d 168 (2d Cir. 2010) ....................................................... 57

*United States v. Whren*,
    53 F.3d 371 (D.C. Cir. 1995) ...................................................... 40

*United States v. Williams*,
    77 M.J. 459 (C.A.A.F. 2018) ...................................................... 40

*United States v. Winckelmann*,
    73 M.J. 11 (C.A.A.F. 2013) ............................... 41, 43, 46, 48

*Ward v. Texas*,
    316 U.S. 547 (1942) .................................................................... 36

*Warszower v. United States*,
    312 U.S. 342 (1941) .................................................................... 53

*Women's Equity Action League v. Cavazos*,
    906 F.2d 742 (D.C. Cir. 1990) .................................................... 24

*Wong Sun v. United States*,
    371 U.S. 471 (1963) .................................................................... 53

**U.S. Code**

10 U.S.C. § 822 ........................................................................ 26

10 U.S.C. § 823 ........................................................................ 26

10 U.S.C. § 824 ........................................................................ 26

10 U.S.C. § 873 ................................................................ 22, 30

10 U.S.C. § 874 ........................................................................ 31

10 U.S.C. § 948a ...................................................................... 27

10 U.S.C. § 948b ...................................................................... 15

10 U.S.C. § 948d ...................................................................... 27

10 U.S.C. § 948i ....................................................................... 27

10 U.S.C. § 948j ....................................................................... 27

10 U.S.C. § 948m ..................................................................... 27

10 U.S.C. § 948r ............................................... 1, 5, 22, 34, 36, 38

10 U.S.C. § 950b ................................................................ 29, 31

10 U.S.C. § 950c ...................................................................... 29

10 U.S.C. § 950f ................................................................. 29, 30

10 U.S.C. § 950g ............................................................. 1, 29, 30

10 U.S.C. § 950i ....................................................................... 31

10 U.S.C. § 950j ....................................................................... 30

10 U.S.C. § 950v ...................................................................... 16

18 U.S.C. 2339B ................................................................ 17, 50

**Legislative Materials**

Cong. Rec. ............................................................................... 32

GAO-13-31, *Guantánamo Bay Detainees*, at 11 (Nov. 2012) ............................. 8

S. Prt. 110-54, *Inquiry into the Treatment of Detainees in U.S. Custody*, 110th Cong., 2nd sess (Nov. 20, 2008) .......................... 8-13, 37, 38

**Executive Materials**

AR 15-6, *Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility*, at 9 (Apr. 1, 2005) .................................................................................. 9, 11-13

DOJ-NSD, Chart of Public/Unsealed Terrorism and Terrorism-Related Convictions, 9/11/01 – 12/31/2017 (Apr. 20, 2018)........................ 50

E.O. 13567, 76 Fed. Reg. 13277 (Mar. 7, 2011) .................................................. 43

Joint Staff External Review of Intelligence Operations at Guantanamo Bay, Cuba (Sept. 10, 2002) ....................................................... 10

Joint Task-Force Guantanamo, Camp Delta, Standard Operating Procedures  (Mar. 28, 2003) ............................................. 10, 12, 37

Military Commission Rules of Evidence (2007)........................................... 47, 48

Regulation for Trial by Military Commission (2007) ............................. 16, 27-30

Rules for Courts-Martial..................................................................................... 31

Rules for Military Commission ...............................................16, 18, 27-31, 44-46

USDOJ, Office of Inspector General, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* (Oct. 2009) ............................................................................. 12, 13

**Miscellaneous**

9/11 COMMISSION REPORT ................................................................................... 19

Center on National Security, *By the Numbers: U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013* ..................................... 50

*Members Only: Al Qaeda's Charter List Revealed after 13 Years in US Hands*, JUST SECURITY (Jan. 29, 2015)..................................... 19

Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, Washington Post, Jan. 14, 2009 ...................... 32

Wright & Miller................................................................................................. 24

# GLOSSARY OF TERMS

CAAF ...................................................U.S. Court of Appeals for the Armed Forces

CMCR...................................................U.S. Court of Military Commission Review

DEPSECDEF............................................................. Deputy Secretary of Defense

DOJ-OIG Report ......... USDOJ, Office of Inspector General, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* (Oct. 2009)

GAO Report..........................GAO-13-31, *Guantánamo Bay Detainees* (Nov. 2012)

JTF-GTMO SOP ..................................Joint Task-Force Guantanamo, Camp Delta, Standard Operating Procedure (Mar. 28, 2003)

MCA ...............................Military Commissions Act of 2006, 120 Stat. 2600 (2006)

MCA 2009 .....................Military Commissions Act of 2009, 123 Stat. 2190 (2009)

MCRE............................................. Military Commission Rules of Evidence (2007)

RMC ................................................. Rules for Trial by Military Commission (2007)

RTMC.....................................Regulation for Trial by Military Commission (2007)

SASC Report ..................S. Prt. 110-54, *Inquiry into the Treatment of Detainees in U.S. Custody*, 110th Cong., 2nd sess. (Nov. 20, 2008)

Schmidt-Furlow Report .................... AR 15-6, *Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility* (Apr. 1, 2005)

Secretary .................................................................................. Secretary of Defense

UCMJ .......................... Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq.*

## JURISDICTIONAL STATEMENT

On June 3, 2022, Petitioner filed a timely petition for review from a decision of the Court of Military Commission Review. 10 U.S.C. § 950g.

## QUESTIONS PRESENTED

1.      Given the Supreme Court's decision in *United States v. Arthrex*, 141 S. Ct. 811 (2020), must the Convening Authority for Military Commissions be a principal officer?

2.      Did the Court of Military Commission Review ("CMCR") err as a matter of law in reaffirming Petitioner's sentence of life without parole based upon involuntary custodial statements that Respondent did not dispute are now inadmissible under 10 U.S.C. § 948r?

3.      Did the CMCR abuse its discretion when it dispensed with resentencing in favor of its own reassessment of the record for harmless error?

4.      Did the CMCR abuse its discretion in holding that the vacatur of two of Petitioner's charges of conviction could have had no influence on Petitioner's aggregate sentence of life without parole?

## STANDARDS OF REVIEW

The first question presented relates to subject-matter jurisdiction, which this Court reviews *de novo*. *Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014).

The second presents a question of law respecting the admissibility of statement evidence, which this Court reviews *de novo*. *United States v. Baird*, 851 F.2d 376, 380 (D.C. Cir. 1988).

The third and fourth present sentencing questions that this Court reviews for an abuse of discretion. *Bahlul v. United States*, 967 F.3d 858, 866 (D.C. Cir. 2020). A lower court abuses its discretion when it commits procedural error, such as "selecting a sentence based on clearly erroneous facts." *In re Sealed Case*, 552 F.3d 841, 844 (2009) (cleaned up). Likewise, a lower court "by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996), including with respect to the standard of review and whether a constitutional error is harmless beyond-a-reasonable-doubt, both of which this Court reviews *de novo*. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *United States v. Bresnahan*, 62 M.J. 137, 145 (C.A.A.F. 2005). A lower court also abuses its discretion in failing to order resentencing unless this Court is "confident that [the lower court] could reliably determine what sentence the members would have imposed." *United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (cleaned up).

2

## SUMMARY OF ARGUMENT

Fourteen years ago, Petitioner was the third defendant convicted in the military commission system created for Guantanamo detainees. Since then, the legal landscape has changed dramatically. Within a year, Congress overhauled the military commissions' statutory framework and procedures. This Court vacated two of the three charges underlying Petitioner's sentence as *ex post facto* violations, including the "central charge" around which prosecutors built their case. Respondent excluded convicts, such as Petitioner, from the parole system it ultimately created for Guantanamo detainees and ultimately prosecuted so few Low-Value Detainees, that Petitioner has been and will continue to be held in near total solitary confinement. And the Supreme Court issued a series of decisions on the Appointments Clause that cast significant doubt on the manner military commissions were convened and administered at the time of Petitioner's trial.

Petitioner is serving a sentence of life without parole in solitary confinement. That is a punishment whose severity no one anticipated at the time of his trial and that is based upon legal premises that have long since been rejected or abandoned. Petitioner therefore asks this Court to vacate the judgment below or, at a minimum, remand for resentencing because there is no good faith legal basis to sustain such an extreme result on the record in this case.

1.      This Court previously held that the Convening Authority, who both
convened the military commission to prosecute Petitioner and finalized its
judgment, was an inferior officer for Appointments Clause purposes. *Bahlul*, 967
F.3d at 870-73. This Court recognized that many of the Convening Authority's
most consequential decisions, indeed the decisions that required her to be an
officer in the first place, were "unreviewable." *Ibid*. But it held that this was
permissible under pre-*Arthrex* circuit precedent, so long as she was generally
subject to "oversight" within the Executive Branch. *Ibid*.

In *Arthrex*, the Supreme Court held that only Senate-confirmed presidential
appointees may be delegated "the 'power to render a final decision on behalf of the
United States' without any such review by their nominal superior or any other
principal officer in the Executive Branch." *Arthrex*, 141 S. Ct. at 1981 (quoting
*United States v. Edmond*, 520 U.S. 651, 665 (1997)). And it held that Executive
oversight of the *decision-making*, not the decisionmaker, is what matters. For an
officer responsible for "adjudicating the public rights of private parties," such as
the Convening Authority, "unreviewable authority … is incompatible with their
appointment by the Secretary to an inferior office." *Id*. at 1986.

Because this Court has already held that the Convening Authority was an
inferior officer with the power to make significant "unreviewable" decisions that
bound the Executive Branch, the judgment must be vacated for lack of jurisdiction.

4

**2.** Among the most important changes that Congress made to the military commission system in 2009 was to forbid the use of an accused's involuntary statements for any purpose. 10 U.S.C. § 948r. Here, Respondent did not dispute that the custodial statements that made most of the evidence at Petitioner's trial and in the CMCR's decision reaffirming his sentence could not meet this standard. Indeed, prosecutors involved in Petitioner's case at its inception internally objected to the fact that the case against him was tainted by torture and the "systematic destruction of statements" that were exculpatory. App. 93. The CMCR's reliance on these uncorroborated and involuntary statements, taken alone, compels reversal and warrants resentencing to ensure Petitioner is not serving life without parole based upon tainted evidence.

**3.** Military commissions, like courts-martial, impose aggregate sentences, such that a single sentence is imposed for all the charges of conviction taken together. The choice of that aggregate sentence is left to the discretion of the members (*i.e.* military jury), who may impose anything from no punishment to life imprisonment. Because this Court vacated two of the three offenses underlying Petitioner's conviction on constitutional grounds, resentencing is required unless the record makes clear beyond-a-reasonable-doubt that the impact of the two wrongful convictions were so immaterial to the sentence imposed, or the sentence

after being reduced on review, that the error was harmless. *Chapman v. California*, 386 U.S. 18, 24 (1976).

This Court previously held, given the statutory and due process rights military accused have to member sentencing, that the proper framework for analyzing harmlessness is the military justice caselaw arising out of *United States v. Sales*, 22 M.J. 305, 307 (C.M.A. 1986). *Bahlul*, 967 F.3d at 866. Here, the CMCR committed at least two errors in its application of *Sales*.

*First*, the CMCR failed to find that it could "reliably determine what sentence would have been imposed at the trial level if the error had not occurred" beyond-a-reasonable-doubt. *Sales*, 22 M.J. at 307. That failure to apply to proper standard under *Chapman* (and *Sales*) is a per se abuse of discretion warranting reversal. *Bahlul*, 967 F.3d at 867. *Second*, even assuming it articulated the correct standard, there is no basis to conclude, let alone for this Court to be genuinely "confident," *Buber*, 62 M.J. at 479, that the CMCR has such "extensive experience with the level of sentences imposed for [conspiracy] offenses under various circumstances" that it could reliably determine what sentence the members would have imposed based upon the record alone. *United States v. Moffeit*, 63 M.J. 40, 41 (C.A.A.F. 2006). No court, let alone the CMCR, could reliably determine what sentence members would have imposed for a charge that had never been successfully tried before, based upon the record of a trial whose "central charge"

6

was vacated and conducted in a novel criminal justice system that has yielded seven sentencing decisions in its history, only three of which the CMCR has reviewed on the merits.

**4.** Even assuming the CMCR could reliably determine beyond-a-reasonable-doubt what sentence the members would have imposed for inchoate conspiracy alone, it abused its discretion in holding that the members would have imposed life without parole based upon the record in this case. *First*, the facts the CMCR determined to be most aggravating in favor of such a sentence were all based upon Petitioner's uncorroborated statements, which are incapable as a matter of law of establishing any fact beyond-a-reasonable-doubt. *Second*, the CMCR drew materially incorrect inferences from the record to find that Petitioner played a role in the September 11th attacks. And *third*, even assuming the record in the light most favorable to the CMCR's reimagination of it, the CMCR's resort to legal and factual theories never presented to the members demonstrates that Petitioner's unlawful prosecution on two of the three charges that underlay his sentence, including the "central charge" around which prosecutors built their actual case, was not harmless beyond-a-reasonable-doubt.

## STATEMENT OF FACTS

**Petitioner's arrest, pre-trial confinement, and interrogation.** Petitioner is a Yemeni national. In 1999, he traveled to Afghanistan and became a follower of Usama bin Laden. He returned to Yemen in December 1999, but then left again for Afghanistan in the spring of 2000 to join al Qaeda. He was arrested by local authorities in Pakistan in December 2001 and turned over to U.S. custody.

In January 2002, the Secretary of Defense ("Secretary") approved the creation of a detention facility in Guantanamo, whose singular purpose was "to exploit human intelligence resources and facilitate and assist in gathering evidence for potential legal proceedings." App. 49. This was done on the premise that detainees had no protections under either the Constitution or international law. S. Prt. 110-54, *Inquiry into the Treatment of Detainees in U.S. Custody*, 110th Cong., 2nd sess., at 1 (Nov. 20, 2008) ("SASC Report").[1]

Petitioner was among the first men transferred to Guantanamo and was initially held in Camp X-Ray, a cluster of "chain-link enclosures on concrete slabs" open to the elements. GAO-13-31, *Guantánamo Bay Detainees*, at 11 (Nov. 2012) ("GAO Report").[2] Human intelligence exploitation was performed in enclosed structures, or "booths," in which detainees would be left for indeterminate periods

---

[1] https://perma.cc/BLM5-R4YE

[2] https://perma.cc/P5QB-KGKK

and which were purposefully "not air-conditioned, to make the detainees uncomfortable." AR 15-6, *Investigation into FBI Allegations of Detainee Abuse at Guantanamo Bay, Cuba Detention Facility*, at 9 (Apr. 1, 2005) ("Schmidt-Furlow Report").[3] After approximately three months, Petitioner was moved to Camp Delta, a collection of "open-air, single-cell structures with steel mesh walls," and later to isolation cells in Camp Echo. GAO Report, at 12.

As the Senate Armed Services Committee found, Respondent developed protocols for the interrogation of Petitioner and other detainees from "Chinese Communist techniques used during the Korean war to elicit false confessions." SASC Report, at xiii. These involved stripping "their clothing, placing them in stress positions, putting hoods over their heads, disrupting their sleep, treating them like animals, subjecting them to loud music and flashing lights, and exposing them to extreme temperatures." *Ibid.*

During the period Petitioner was being interrogated, Guantanamo personnel were trained, authorized, and encouraged to use these techniques and other forms of brutalization during interrogation and detention operations. SASC Report, at 11. The personnel responsible for Petitioner's detention and interrogation were trained on "isolation and degradation," "sensory deprivation," "physiological pressures,"

---

[3] https://perma.cc/JL4B-NLFM

9

and "psychological pressures." *Id*. at 9. "[T]raining slides … presented to

interrogation personnel deploying for GTMO," further encouraged the use of

culturally specific degradation tactics, such as "'religious disgrace' and 'invasion

of personal space by a female' as methods to defeat resistance." *Id*. at 88.

Petitioner was understood to be a test subject in "'America's Battle Lab' in

the Global War on Terrorism," in which every aspect of his detention was

administered "to create an environment that would be conducive to extracting

information by exploiting the detainee's vulnerabilities." Joint Staff External

Review of Intelligence Operations at Guantanamo Bay, Cuba at 2, 11-12 (Sept. 10,

2002), App. 53-54; SASC Report, at 42. A 2002 policy memo instructed that "all

aspects of the [detention] environment should enhance capture shock, dislocate

expectations, foster dependence, and support exploitation to the fullest extent

possible." SASC Report, at 52. This was reiterated in a 2003 manual on detention

operations, stating the facility's overriding objective as "isolating the detainee and

fostering dependence of the detainee on his interrogator." Joint Task-Force

Guantanamo, Camp Delta, Standard Operating Procedure § 4-20 (Mar. 28, 2003)

("JTF-GTMO SOP"), App. 83.

Petitioner's day-to-day detention was governed by the principle that

intelligence officials should have "full control of the detainees' environment.

Treatment, rewards, punishment, and anything else associated with a detainee

10

should be centrally orchestrated by the debriefing team responsible for obtaining information from that detainee." SASC Report, at 12. So, for example, detainees would be subject to repeated strip searches, not for penological purposes, but "as a control measure on direction of the interrogators." Schmidt-Furlow Report, at 19.

For the first year of Petitioner's detention in Guantanamo, there was little written guidance on the conduct of interrogations or detention operations. SASC Report, at 42. Administrators assessed the limits on the use of brutality as "basically subject to perception. If the detainee dies you're doing it wrong." *Id*. at 55. Coercive interrogation became so integrated into the facility's operations that its practice was ultimately incorporated into both draft and promulgated standard operating procedures ("SOPs"). One instructed, "the interrogation tactics used at U.S. military SERE schools are appropriate for use in real-world interrogations. These tactics and techniques are used at SERE school to 'break' detainees. The same tactics and techniques can be used to break real detainees during interrogation operations." JTF GTMO "SERE" Interrogation Standard Operating Procedure (Dec. 10, 2002), App. 84-89. This SOP went on to describe protocols for slapping detainees, "walling," forced nudity, and a catalog of stress positions given names such as "Worship-the-Gods." *Ibid*.

The SOP on detention operations, promulgated in early 2003, described the importance of using psychological pressure and physical brutality to "enhance and

11

exploit the disorientation and disorganization felt by a newly arrived detainee in the interrogation process." JTF-GTMO SOP § 4-20, App. 83. It further memorialized the practice of conditioning the satisfaction of detainees' basic psychological needs to coerce compliance during interrogation, including the provision of "Koran, prayer beads and prayer cap distributed by interrogator," "Contacts decided by interrogator," and "Interrogator decides when to move the detainee to general population." *Ibid*.

Intelligence goals were established for each detainee, such as "to 'break the detainee and establish his role in the attacks of Sept[ember] 11, 2001.'" SASC Report, at 76. To achieve these goals, detention personnel routinely used "[p]rolonged short-shackling [i.e. hog-tying]. … This technique was sometimes used in conjunction with holding detainees in rooms where the temperature was very cold or very hot in order to break the detainees' resolve." USDOJ, Office of Inspector General, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq*, at xxii (Oct. 2009) ("DOJ-OIG Report").[4] Hog-tying was also used in conjunction with strobe lights and loud music ("futility music"), such as "Metallica, Britney Spears, and rap music." Schmidt-Furlow Report, at 9. "[I]nterrogation personnel and military

---

[4] https://perma.cc/DTZ7-CDKE

police … forced detainees to engage in physical training," SASC Report, at 132, and threatened to send them to countries with reputations for torture and extrajudicial execution. *Id*. at 88; 140. Until late 2003, "dietary manipulation, environmental manipulation, sleep adjustment, false flag, presence of military working dogs, sleep management, stress positions, and yelling, loud music, and light control" were all authorized. *Id*. at 204.

Documented instances of improvised abuse included the prohibition on prayer, the forced wearing of a bra, leading detainees around by a leash, placing thong underwear on their heads, or forcing them to stand naked before female personnel. Schmidt-Furlow Report, at 20. While infrequent in practice, these instances made the threat of sexual humiliation both routine and effective as a tool of menace. SASC Report, at 133-34; DOJ-OIG Report, at 335.

To "deprive detainees of human contact as a means of reducing their resistance to interrogation," Guantanamo personnel subjected detainees such as Petitioner to weeks and months of isolation. DOJ-OIG Report, at 355. It was also policy to subject detainees to protracted sleep deprivation, via the "frequent flyer program," in which Guantanamo personnel would move a detainee from cell to cell every few hours for days and weeks. DOJ-OIG Report, at 183; SASC Report, at 147-48.

13

In March 2004, a military prosecutor working on Petitioner's case internally objected that he had reviewed interrogation records in which Petitioner denied being a member of Al Qaeda, and that there was "reason to believe that al Bahlul had suffered … mistreatment or torture." App. 92. He further alleged that prosecutors' selection of interrogation records as evidence against Petitioner was "deliberate and misleading," *ibid*., and compromised by the "systematic destruction of statements of the detainees." App. 93.[5] Another military prosecutor further protested that Respondent was ignoring these issues and, as a result, "pressing ahead with cases that would be marginal even if properly prepared." App. 100.

**Military commission proceedings.** Three months later, Respondent convened a military commission to prosecute Petitioner on a single count of conspiracy. App. 138-139. The overt acts in support of the charge alleged that Petitioner provided secretarial services to bin Laden and edited a propaganda film known as the "COLE Video," because it featured news footage of the bombing of

---

[5] The CMCR stated that Petitioner was "interviewed nine times while in United States custody." App. 7 n.7. This is incorrect. The prosecution submitted nine statements as exhibits during litigation, but never claimed that these reflected all of Petitioner's statements or that all of Petitioner's interrogations were memorialized. There are an unknown number of interrogation reports that were not submitted as exhibits or provided in discovery in which Petitioner both denied meaningful involvement in Al Qaeda and complained of being tortured. App. 92. Evidently, these documents were destroyed or otherwise lost. *Ibid*.

the USS COLE. Petitioner has never been alleged to have directly participated in or had any foreknowledge of any terrorist attack, and a prosecutor in Petitioner's case publicly described him as a "Little Fish." App. 116.

Petitioner objected on various grounds, including that he was unable to defend himself due to the secrecy and classification rules, which permitted the admission of confessions "yielded under --- under torture." App. 190. He further prepared nine written objections that he read into the record (called the "Nine Points"). While the translation quality is extremely poor and the record inexplicably omits Objection #4 altogether, Petitioner's written objections included the "secret evidence issue" and the fact that the military commission was operated by the same institutions who "carries out torture." App. 180-186. His appointed military counsel further challenged the admissibility of statement evidence obtained from Petitioner under torture, prompting the then-presiding military judge to note that coerced statements were not inadmissible per se. App. 193-197. This commission disbanded following *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).

Congress subsequently enacted the Military Commissions Act of 2006, 120 Stat. 2600 ("MCA"), which was modeled on the structures, rules, and procedures governing courts-martial under the Uniform Code of Military Justice ("UCMJ"). 10 U.S.C. § 948b(c). Like courts-martial, military commissions under are convened ad hoc to prosecute specified defendants for specified crimes. *See*

Regulation for Trial by Military Commission ("RTMC") § 5-3 (2007) ; Rule for

Military Commission ("RMC") 504(b) (2007). Under the MCA, military

commissions "may be convened by the Secretary of Defense or by any officer or

official of the United States designated by the Secretary for that purpose." 10

U.S.C. § 948h; RMC 103(8). An individual so designated is the Convening

Authority for Military Commissions ("the Convening Authority"), who heads the

military commission system and reports to the Secretary and the Deputy Secretary

of Defense ("DEPSECDEF") as appropriate. RTMC § 2-1, 2-3(b).

Following the MCA's enactment, the Secretary designated DEPSECDEF as

the Convening Authority. App. 46. On January 5, 2007, DEPSECDEF created the

position of "Director, Office of Military Commissions," a three-year,

nonrenewable, limited-term employee position in the Senior Executive Service.

App. 40. On January 31, 2007, DEPSECDEF hired Ms. Susan Crawford

("Crawford") into that position. App. 41-42. On February 6, 2007, the Secretary

issued a two-sentence memorandum designating Crawford as the Convening

Authority and rescinding his previous designation of DEPSECDEF. App. 46.

In February 2008, Crawford convened a military commission to prosecute

Petitioner for three of the MCA's inchoate crimes. App. 140-145. The first charge,

conspiracy (10 U.S.C. § 950v(b)(28) (2006)), was substantively identical to the

previous conspiracy charge. He was also charged with providing material support

16

to a terrorist organization (10 U.S.C. § 950v(b)(25) (2006)) and with solicitation (10 U.S.C. § 950u (2006)) based on his alleged editing of the COLE Video.

Petitioner was not charged with any substantive crime, nor with complicity in any completed crime. With respect to the charge of material support, Petitioner was only charged with the 18 U.S.C. § 2339B variant of the offense. Prosecutors further disclaimed any allegation that Petitioner was guilty of a substantive crime via a conspiracy-type theory of liability, and *sua sponte* struck language from the original conspiracy charge alleging that Petitioner "join[ed] al Qaeda, an enterprise of persons who shared a common criminal purpose, that involved, at least in part, the commission or intended commission of [a war crime]." Prosecutors stated the effect of this change would "reduce[] the offense." App. 216-217.

During pre-trial proceedings, Petitioner attempted to again assert his Nine Points. App. 201-203. For reasons that remain unclear, Respondent retained custody of Petitioner's legal papers and lost the only known copy of the Nine Points. In its place, a portion of transcript from a prior hearing discussing the Nine Points was entered into the record. App. 202.

Petitioner complained of being threatened with being sent to Egypt because of "their bad reputation in getting information by force," and that Respondent "since 2002 until now, practice the torturing but in a more civil way and smart and tortures for the calls of torturing, not only tortures to extract information." App.

17

199-200. Defense counsel also asserted Petitioner's right to mandatory discovery (*i.e.* RMC 701(b) and *Brady v. Maryland*, 373 U.S. 83 (1963)). App. 213-214.

Prosecutors built their case around Petitioner's role in the editing of the COLE Video, which they described as "propaganda, political argument, and indoctrination of solicitation." App. 221. While Petitioner's participation in the production of the COLE Video was listed as an overt act in support of the conspiracy and material support charges, prosecutors explained in their opening statement that the film was the foundation of the "central charge" in the case: solicitation. App. 226. In fact, prosecutors built their case around this film to such an extent that during *voir dire*, the military commission judge excused a member *sua sponte* after learning that his unit had participated in a USS COLE sailor's funerary honor guard. App. 218-219.

Prosecutors called fourteen witnesses. The first, second, third, fourth, and thirteenth witnesses were law enforcement agents who testified to the physical evidence connecting Petitioner to production of the COLE Video and placing him at a camp in Afghanistan, where some of the footage in the COLE Video was taken. The fifth witness testified that Petitioner wrote letters purporting to incriminate himself in 2005. The sixth, seventh, eighth, and tenth witnesses recounted admissions Petitioner allegedly made during custodial interrogations in 2002 and 2003. The ninth, eleventh, and twelfth witnesses were convicted

18

terrorists brought to testify in support of the solicitation charge about having

watched the COLE Video. And as its last witness, also in support of the solicitation

charge, prosecutors called a "propaganda expert [to] breakdown this video and

place it in the context of other propaganda[.]" App. 222.

    In its opening statement, prosecutors told the members that Petitioner's

"most immediate role was as the personal secretary of Usama bin Laden." App.

219. Throughout the trial, Petitioner's role in Al Qaeda was described as providing

technical support, running the hardware van, working in the media office, serving

as a secretary, being responsible for "carry[ing] media equipment, bin Laden's

laptop computer, [and] a satellite downlink so they could keep in touch with the

news." App. 224-225; 242; 246-247.[6] The testimony further showed that Petitioner

neither participated in nor had any foreknowledge of the September 11th attacks.

App. 244. And with respect to all but the allegations that he contributed to the

editing of the COLE Video and served as a secretary, the evidence against

Petitioner comprised uncorroborated statements allegedly made to Guantanamo

interrogators and a letter he gave to detention personnel in 2005. App. 172.

_____

[6] The testimony characterizing Petitioner's peripheral role is confirmed by other
court records respecting the operations of al Qaeda's "Media Center" and the
COLE Video. App. 118-137. Petitioner appears nowhere in the 9/11 COMMISSION
REPORT OR on al Qaeda's member list. *See Members Only: Al Qaeda's Charter
List Revealed after 13 Years in US Hands*, JUST SECURITY (Jan. 29, 2015),
https://perma.cc/8LC3-5VGW. And in the only statement provided in discovery
from any other detainee, Petitioner is described as a "bodyguard." App. 117.

19

The military commission judge instructed the members that the offenses were inchoate and, with respect to conspiracy, "proof that [any one of the underlying law of war offenses] actually occurred is not required." App. 249; *see also* App. 250 ("the overt act required for this offense does not have to be a criminal act."). The commission found Petitioner guilty on all charges.

The sentencing hearing commenced the same day. Prosecutors again placed the solicitation charge at the center of their case. The only two witnesses were victims of the USS COLE attack, who testified about what it meant for them to see the attack exploited in the COLE Video to solicit terrorism. Prosecutors advocated for a life sentence because Petitioner had "unleashed an ongoing solicitation." App. 257. And they explained that life was compelled by the nature of the solicitation charge, stating "Members of the panel, you can add another message to that video every time it is played: [Petitioner], the maker of this message, will make no more." *Ibid*.

Prosecutors only mentioned the conspiracy charge twice during sentencing to emphasize Petitioner's having been convicted of multiple charges. App. 253-254; 257. Petitioner made an unsworn statement in which he variously accused the United States of persecuting Muslims. And the members returned a sentence of life imprisonment. App. 258.

20

**Post-trial proceedings.** In June 2009, Crawford approved the judgment and sentence without exception, App. 152, and Petitioner opted to have his case reviewed by the CMCR. In 2011, the CMCR affirmed. *United States v. Bahlul*, 820 F.Supp.2d 1141 (CMCR 2011). Petitioner timely petitioned for review in this Court, which vacated Petitioner's conviction on all charges twice. *Bahlul v. United States*, 792 F.3d 1 (D.C. Cir. 2015); *Bahlul v. United States*, No. 11-1324, 2013 WL 297726 (D.C. Cir., Jan. 25, 2013) (per curiam). In both instances, Respondent obtained rehearing *en banc*. *Bahlul v. United States*, 840 F.3d 757 (D.C. Cir. 2016) (en banc); *Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc). The result was the vacatur of Petitioner's conviction on all charges except conspiracy on *ex post facto* grounds and remand to the CMCR.

While Petitioner's case was on remand, the Supreme Court decided *Lucia v. SEC*, 138 S. Ct. 2044 (2018). Petitioner raised a timely jurisdictional challenge asserting, *inter alia*, that only principal officers may be designated as the Convening Authority.

The CMCR again affirmed Petitioner's conviction and sentence. Respecting his challenge to Crawford's appointment, the CMCR agreed that under *Lucia*, the Convening Authority must be an officer and that if Crawford's appointment was defective under the Appointments Clause, Petitioner's conviction would have to be vacated for lack of jurisdiction. *Bahlul v. United States*, 374 F. Supp. 3d 1250,

1261 (CMCR 2019). But it concluded under this Court's precedents, that Crawford was lawfully appointed as an inferior officer, which was permissible because she was "supervised at some level" by the Secretary. *Id.* at 1270-71.

Petitioner timely petitioned for review. This Court reversed and remanded to the CMCR, holding that it applied the wrong burden of proof in reaffirming his sentence. *Bahlul*, 967 F.3d at 867. It affirmed the CMCR's conclusion that Crawford was lawfully appointed as an inferior officer. *Id*. at 870-73. It recognized that the Convening Authority could make binding final decisions, "all of which are effectively unreviewable." *Id*. at 872. Nevertheless, it concluded that under circuit precedent, an inferior officer need only be subject to "'some level' of direction and supervision by a principal officer, not necessarily total control." *Id*. at 873.

On remand, Petitioner argued, *inter alia*, that under the Supreme Court's intervening decision in *United States v. Arthrex*, 141 S. Ct. 811 (2020), the Convening Authority needed to be a principal officer. Petitioner maintained that resentencing was required because there was no basis to conclude beyond a reasonable doubt that he would have been sentenced to life without parole for his remaining conspiracy conviction alone. And he further objected to the CMCR's use of his custodial statements in the reassessment of his sentence, as both uncorroborated and inadmissible under 10 U.S.C. § 948r. In its briefing, Respondent never disputed that Petitioner's statements were now inadmissible.

The CMCR rejected Petitioner's Appointments Clause arguments for what appear to be law of the case grounds. App. 6. With respect to sentencing, the CMCR heeded this Court's instruction that it apply the two-step framework articulated in *Sales*. The CMCR first determined that resentencing was not required. Then it reaffirmed his sentence of life without parole based upon four overt acts underlying the conspiracy charge. App. 22. Three of these overt acts were proven exclusively by Petitioner's involuntary and uncorroborated custodial statements. Yet, at no point did the CMCR address Petitioner's objections to the use of these statements in making its findings.

Petitioner moved for rehearing/reconsideration, respecting both material errors of fact in the CMCR's opinion and its improper use of his uncorroborated and involuntary custodial statements, which was denied. App. 35.

## ARGUMENT

### I.  PETITIONER'S MILITARY COMMISSION LACKED JURISDICTION BECAUSE THE CONVENING AUTHORITY WAS NOT A PRINCIPAL OFFICER.

**A.  *Arthrex* compels this Court to reassure itself of jurisdiction.**

This Court has an ongoing duty to assure itself that the tribunal that rendered the judgment under review had jurisdiction. *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012); 5B Wright & Miller § 1350. This rule has special force in the military context, where the record must show "affirmatively and unequivocally that the court was legally constituted" and where there are "no presumptions in its favor." *McClaughry v. Deming*, 186 U.S. 49, 63 (1902); *see also United States v. Denedo*, 556 U.S. 904, 909 (2009).

While law of the case principles extend to jurisdictional determinations generally, *LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996), those principles do not overcome intervening legal or factual developments that call a prior jurisdictional ruling into doubt. *See*, *e.g.*, *Bronner v. Duggan*, 962 F.3d 596, 599 (D.C. Cir. 2020); 18B Wright & Miller, Fed. Prac. & Proc. § 4478.5. And when a prior decision is called into doubt by intervening Supreme Court precedent, the law of the case must yield to "the law of the land." *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 n.14 (D.C. Cir. 1990).

24

This Court previously held that "several of the Convening Authority's consequential powers … are effectively unreviewable." *Bahlul*, 967 F.3d at 872. It nevertheless held that the Convening Authority could be an inferior officer based upon the then-prevailing circuit law under which inferior officers could make unreviewable final decisions that bound the United States, so long as the officers themselves were subject to "some level" of supervision and control within the Executive Branch. *Id*. at 871. This Court had identified "three factors drawn from *Edmond*" and based upon the balancing of the "factors identified by *Edmond* and our subsequent cases," it concluded that an inferior officer could wield "unreviewable" authority, so long as they were subject to "oversight" through rulemaking, personnel rules, and removability. *Ibid*.

The CMCR held that *Arthrex* neither "change[d] the legal landscape for assessing the applicability of the Constitution's Appointments Clause" nor "undercut[] the D.C. Circuit's resolution" of the constitutional status of the Convening Authority. App. 7. And relying on this Court's pre-*Arthrex* precedent, it opined that "the *Edmond* factors clearly dictate that a convening authority is an inferior officer." App. 6.

The Supreme Court, however, squarely rejected the balancing approach that this Court had developed, and that the United States had advanced in *Arthrex* itself. Instead, the Supreme Court held that where decision-making authority is what

25

makes an official an "officer[] exercising 'significant authority' in the first place," those decisions – and not merely the decisionmaker – must be under the control of a principal officer. *Arthrex*, 141 S. Ct. at 1980.

Where this Court's three-factor test relied upon a "catalog of steps the [Secretary] might take to affect the decision-making process" to "indirectly influence" a Convening Authority's decisions, *Arthrex* held that this kind of indirect influence "is not the solution. It is the problem." *Arthrex*, 141 S. Ct. at 1981-82. And where this Court recognized that a Convening Authority made "unreviewable" final decisions but held that this was permissible for an inferior officer because "total control" was not required, the Supreme Court stated without qualification that an official's "unreviewable authority … is incompatible with their appointment by the Secretary to an inferior office." *Id*. at 1985.

*Arthrex* is, therefore, an "intervening change of controlling law." *See Cannabis Therapeutics v. DEA*, 15 F.3d 1131, 1134 (D.C. Cir. 1994).

**B.    The Convening Authority is an agency head with the discretion to make unreviewable final decisions that bind the United States.**

Under the UCMJ, convening authority may only be exercised by senior military officers and other specified officials. 10 U.S.C. §§ 822-24. Nearly all – if not all – are Senate-confirmed Presidential appointees. Under the MCA, the Convening Authority is the head of the military commission system, initiates and

directs the entirety of the trial process, retains broad discretion over the post-trial process, and wields a scope of discretion and final decision-making authority that exceeds even the wide discretion accorded courts-martial convening authorities.

Before trial, the Convening Authority decides which individuals should be tried for which charges. 10 U.S.C. § 948a; RTMC §§ 2-3(a)(1); 4-1(b); RMC 407; 601(a); 601(b). She determines whether the case is capital. 10 U.S.C. § 948d(d); RTMC §§ 4-1(b); 4-3(a); 4-3(c). She appoints and supervises the members, whom she can also remove, albeit only for "good cause" once trial on the merits has begun. 10 U.S.C. §§ 948i; 948m; RTMC §§ 2-3(a)(3); 5-2(h); RMC 502(a)(1); 503(a); 505(c). She appoints and supervises the Chief Judge of the Military Commissions Trial Judiciary, who in turn selects a military judge to preside over the case. 10 U.S.C. § 948j(a); RTMC §§ 1-5(b); 6-1(b); RMC 503(b)(2). She appoints the Court Security Officer, who determines when the proceedings may be closed to the public. RTMC § 7-4. She appoints, supervises, and approves funding for personnel to administer the proceedings. RTMC §§ 2-3(a)(5)-(6); 7-7; 8-6(b)(4). She can order depositions, RTMC § 14-2; RMC 702(b), issue warrants of attachment, RMC 703(e)(2)(G)(i), and convene inquiries into the mental capacity of the accused. RMC 706(b). She can issue protective orders. RTMC 17-3. She can decide motions. RMC 905(j). She determines whether or when trial proceedings

must begin, RTMC § 2-3(a)(2); RMC 707, and where they will take place. RTMC

§ 5-3(a); RMC 504(e).

　　During trial, the Convening Authority may dismiss charges with or without

prejudice "for any reason" before the verdict is announced "in the exercise of that

authority's independent judgment." RMC 604(a). She has the "sole discretion" to

enter into binding plea agreements, RTMC §§ 2-3(a)(8); 12-1; RMC 705(a);

705(d)(3), and to grant immunity. RTMC §§ 2-3(a)(1); 15-1(b)(1); RMC 704(c)(1).

She responds to invocations of the state secrets privilege. RMC 506(f). She has the

exclusive power to fund experts and travel expenses for witnesses. RTMC §§ 2-

3(a)(10); 13-1, 13-7(b); RMC 703(d). She determines what non-military personnel

and resources are available to defense counsel. RTMC §§ 2-3(a)(9); 9-1(a)(4). She

acts as a supervisor of the prosecution, RTMC §§ 8-4(d)(3)-(4); 8-6(b)(1); RMC

501(1), to include the prosecution's communications with the media. RTMC §§ 2-

3(a)(7); 8-7. She is authorized to communicate with other agencies, Congress, the

public, and foreign governments. RTMC § 2-3(b)(4). She can permanently bar

individuals, including attorneys, from participating in military commission

proceedings. RTMC § 10-1(b). She has the final power to find someone in

contempt under 10 U.S.C. § 950w; a decision that is "not subject to further review

or appeal," RMC 809(d), and may only be collaterally attacked. *See*, *e.g.*, *Baker v.

Spath*, 2018 WL 3029140, at *9 (D.D.C., June 18, 2018).

After trial, the Convening Authority has the "sole discretion and prerogative" over the verdict and sentence and the entry of a final judgment. 10 U.S.C. § 950b(c); RTMC § 23-7; RMC 1101(c)(2)(A); 1107. She is bound by no deadline in issuing the order that finalizes (or "approves") the judgment. 10 U.S.C. § 950b(c)(3); RMC 1107(b)(2). She has the "sole discretion" to "approve, disapprove, commute, or suspend the sentence in whole or in part," to include whether a sentence of death should be imposed, 10 U.S.C. § 950b(c)(2)(C), to "dismiss any charge or specification," *id*. § 950b(c)(3)(A), or to reduce any finding of guilty to a lesser included offense. *Id*. § 950b(c)(3)(B); RTMC § 2-3(a)(13); 27-3(d); RMC 1107. She can reopen the proceedings and order the reconsideration of any legal ruling (other than those affecting an acquittal). 10 U.S.C. § 950b(d); RTMC §§ 27-2; 27-3; RMC 810(a)(4); 1009(d); 1102(a); 1107(e).

Further Executive Branch review of the Convening Authority's disposition of a case is, with one limited exception, subject to the election of the accused. Only if the approved sentence is death is CMCR review compulsory. 10 U.S.C. § 950c(b)(1). Otherwise, the accused may waive CMCR review and seek review of the Convening Authority's final decision "outside Article II," *Arthrex*, 141 S. Ct. at 1982, by petitioning this Court directly. *Id*. § 950g.

The Convening Authority controls when post-trial review may begin, 10 U.S.C. § 950c(a); 950f(c) (2006/2009); RTMC § 2-3(a)(14), and is given the sole

power to refer a case to the CMCR, 10 U.S.C § 950c, a power the CMCR recently

determined was jurisdictionally dispositive. *United States v. Khadr*, 568 F.Supp.3d

1266 (CMCR 2021). Even when both a defendant and Respondent ask to refer a

case to the CMCR, the Convening Authority has asserted the discretion to refuse.

App. 157-163.

     The CMCR and this Court may review only "the findings and sentence as

approved by the convening authority," 10 U.S.C. §§ 950f(d); 950g(a); 950g(d), and

only matters raised by the accused. 10 U.S.C. § 950f(c). Unlike the appellate

review scheme approved in *Edmond*, no one in the Executive Branch can initiate

review of the Convening Authority's final decisions in any fora. *Edmond*, 520 U.S.

at 665; *see also McIntosh v. Department of Defense*, ___ F.4th ___, 2022 WL

16826178 at *4 (Fed. Cir., Nov. 9, 2022).

     The Convening Authority can grant requests for a new trial for two years

after issuing the order approving the judgement (a period she can extend

indefinitely), RTMC § 26-4(a); RMC 1210(e), a power that in courts-martial is

reserved to the service secretaries. 10 U.S.C. § 873. Once appellate review is

complete, she has the sole power to issue the "final orders" that close the case,

which are "final and conclusive" and "binding upon all departments, courts,

agencies, and officers of the United States, except as otherwise provided by the

President." 10 U.S.C. § 950j(a) (2006/2009); RTMC 26-4(b). And so long as a

defendant is under a military commission sentence, other than death, she has the

unreviewable discretion to suspend and remit that sentence for any reason, 10

U.S.C. § 950i(d) (2006/2009); RMC 1108(b), a power that in courts-martial is also

reserved to the service secretaries. 10 U.S.C. § 874; RCM 1107(4).

The "power [the Convening Authority] exercises free from control by a

superior" also extends to "matters of law as well as policy." *Arthrex*, 141 S. Ct. at

1982-83. Unlike judges on the CMCR or the services' Courts of Criminal Appeal,

whose authority was at issue in *Edmond*, the Convening Authority can act "for any

reason or no reason," *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010),

and her most significant final decisions are, by statute, committed to her "sole

discretion and prerogative." 10 U.S.C. § 950b(c); 949(b)(2)(C). Except for wholly

administrative decisions, she is statutorily protected from coercion or influence,

including with the threat of removal. 10 U.S.C. § 949b(a)(2)(B); RMC 104(a)(2).

That includes her handling of a particular case or a category of cases. *See*, *e.g.*,

*United States v. Boyce*, 76 M.J. 242, 250 (C.A.A.F. 2017); *United States v.*

*Gerlich*, 45 M.J. 309, 314 (C.A.A.F. 1996).

## C.  Under *Arthrex*, the Convening Authority must be a principal officer.

As this Court has already held, "several of the Convening Authority's

consequential powers" – the very powers that make her an officer in the first place

– are "unreviewable." *Bahlul*, 967 F.3d at 872. The scope and unreviewability of the Convening Authority's powers far surpass what the military appellate judges under review in *Edmond* exercised. A military appellate judge's every decision is governed by "a legal standard subject to appellate review." *Nerad*, 69 M.J. at 146. Yet, the Convening Authority's statutorily protected discretion to act "for any reason or no reason," *ibid.*, shields her most consequential decisions from any possibility of review.

For example, when Petitioner's trial was underway, Crawford dismissed capital charges levied against Mohammed Al-Qahtani, the so-called "20th Hijacker," whose alleged role in the September 11th attacks has been cited by lawmakers as one of the principal reasons Guantanamo exists. *See*, *e.g.*, 159 Cong. Rec. H3594 (2013) (statement of Rep. Cotton). While still in office, Crawford told the press her reason was evidence that Qahtani's pre-trial "treatment met the legal definition of torture." Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, Washington Post, Jan. 14, 2009. But evidence that Petitioner was tortured in U.S. custody was publicly disclosed in 2005. App. 90-107. There was also evidence of torture in the case of another detainee whose military commission Crawford convened *after* she dismissed *Qahtani*. *In re Al-Nashiri*, 835 F.3d 110, 140-41 (D.C. Cir. 2016) (Tatel, J., dissenting). Nothing in

the public record distinguishes these three cases other than Crawford's
unreviewable judgment that they should be treated differently.

The CMCR ignored this Court's holding, despite its being law of the case,
and did not otherwise attempt to reconcile the wide scope of the Convening
Authority's unreviewable decision-making authority with *Arthrex*. In a footnote,
the CMCR stated without elaboration that, "Virtually all [of the Convening
Authority's powers] are (i) reviewable within the Executive Department, (ii)
ministerial, or (iii) both." App. 6 n.5. But this is plainly not true, as this Court has
already held. *Bahlul*, 967 F.3d at 872. And even in making this blanket statement,
the CMCR was compelled to include the qualifier, "virtually," as it was also
compelled to do when asserting that Executive Branch officials "have authority to
review *substantially all* convening authority decisions" and touting its own
"significant authority to review *many such* decisions." App. 6 (emphasis added).

These conspicuous adverbs prove the essential point. As this Court held, the
Convening Authority has the power to make consequential final decisions, *Bahlul*,
967 F.3d at 872, and neither the Secretary, the CMCR, nor the President has any
"means of countermanding the final decision already on the books." *Arthrex*, 141
S. Ct. at 1982. If her decisions provoke public outcry, the Secretary and the
President can avoid accountability by rightfully claiming their hands are tied.

The Convening Authority for Military Commissions must be a principal officer under *Arthrex*. For most of the military commissions' history, the Secretary has designated principal officers to perform this important role. App. 38-39. Crawford, however, was not. And because she was not, the judgment in Petitioner's case must be vacated.

**II.    RESENTENCING IS REQUIRED TO ENSURE THAT PETITIONER IS NOT SENTENCED ON THE BASIS OF EVIDENCE OBTAINED BY TORTURE.**

Most of the evidence at trial and proof of all but one of the four allegations on which the CMCR placed its principal emphasis, App. 7-17; 22, were drawn from uncorroborated and involuntary statements Petitioner allegedly made to interrogators in Guantanamo between 2002 and 2003. The CMCR erred as a matter of law in relying upon these statements to reaffirm his sentence.

While custodial statement evidence was broadly admissible at the time of trial, 10 U.S.C. § 948r(c) (2006), Congress subsequently amended the MCA to prohibit the use of evidence obtained by torture as well as cruel, inhuman, and degrading treatment. 10 U.S.C. § 948r(a). Congress further shifted the burden onto Respondent to show that custodial statements, such as those the prosecution offered here, were both reliable and voluntary. *Id*. § 948r(c).

The CMCR "must apply the law in effect at the time it renders its decision." *Henderson v. United States*, 568 U.S. 266, 271 (2013) (cleaned up); *see Dorsey v.*

34

*United States*, 567 U.S. 260, 274 (2012). That settled rule includes changes to the admissibility of evidence for sentencing purposes. *Clabourne v. Ryan*, 745 F.3d 362, 379–80 (9th Cir. 2014); *see United States v. Guardado*, 77 M.J. 90, 93 (C.A.A.F. 2017). And Congress, in amending the MCA, provided that its amended "procedures and requirements" apply to pending cases, MCA 2009 § 1804(d), excepting only those changes that affected "the validity of any conviction" under the prior law. *Id*. § 1804(a).

Below, Petitioner repeatedly raised the involuntariness of his custodial statements and objected to the CMCR's reliance upon them in reassessing his sentence. Respondent never disputed and therefore can be deemed to have conceded that the statement evidence submitted at Petitioner's trial would no longer be admissible. *See Demore v. Kim*, 538 U.S. 510, 522 (2003); *United States v. Ghailani*, 743 F. Supp. 2d 261, 264 n.1 (S.D.N.Y. 2010). Respondent also made no effort to carry its burden to demonstrate that these custodial statements were reliable, voluntary, and otherwise not obtained from torture.

The CMCR, however, took both the admissibility and content of these statements as a given. Save for a blanket denial from a single member of the CMCR, writing only for himself in a concurrence to the denial of rehearing, App. 36, the CMCR neither addressed Respondent's burden to demonstrate reliability and voluntariness, nor held that Respondent had been met its burden. This error

would be reason enough to reverse. *See Jackson v. Denno*, 378 U.S. 368, 380 (1964). But the CMCR went further, conducting a *sua sponte* dive into the record attachments, again taking as a given uncorroborated claims contained in raw custodial interrogation reports that the prosecution had submitted as exhibits in litigation. App. 7 n.7. The CMCR made no effort to address the admissibility of these reports under 10 U.S.C. § 948r. Nor did it offer any assessment of their relative weight or reliability.

The involuntariness of Petitioner's statements to interrogators is indisputable. "The necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker. If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process." *United States v. Bubonics*, 45 M.J. 93, 94–95 (C.A.A.F. 1996). That includes statements, which are the product of physical brutality as well as "persistent and protracted questioning," "threat[s] [of] …violence," being "held incommunicado without advice of friends or counsel," or after being "taken at night to lonely and isolated places for questioning." *Ward v. Texas*, 316 U.S. 547, 555 (1942).

Here, it is undisputed that Respondent sought to overbear Petitioner's will, impair his capacity for self-determination, and coerce him into incriminating himself throughout 2002 and 2003. Petitioner's very transfer to Guantanamo was

36

to "facilitate and assist in gathering evidence for potential legal proceedings." App. 49. Respondent pursued this aim by making Petitioner a subject in what it termed, "'America's Battle Lab' in the Global War on Terrorism." App. 53. And in the hope of preserving "capture shock," SASC Report, at 52, it worked to "enhance and exploit the disorientation and disorganization felt by a newly arrived detainee in the interrogation process" through physical brutality and psychological pressure. JTF-GTMO SOP § 4-20, App. 82.

Every aspect of Petitioner's custody during this period – from whether he was given clothing, to the temperature of his cell, to whether he was permitted to sleep, to whether he could engage in religious practices – was dictated by the single-minded purpose of "isolating the detainee and fostering dependence of the detainee on his interrogator." JTF-GTMO SOP § 4-20, App. 83. Indeed, two of Petitioner's original prosecutors concluded that the statements upon which prosecutors relied at trial were tainted by credible evidence of not just coercion, but torture that Respondent suppressed. App. 90-101.

It is also undisputed that any statements Petitioner may have made to interrogators under these conditions were "inherent[ly] untrustworth[y]" *Spano v. New York*, 360 U.S. 315, 320 (1959). That is not simply because of the "probable unreliability of confessions that are obtained in a manner deemed coercive." *Jackson*, 378 U.S. at 386. It is because the very methods employed to overbear

37

Petitioner's will "were based on coercive methods used by the Chinese Communist dictatorship to elicit *false confessions*." SASC Report, at xx (emphasis added). And in Petitioner's case, the same military commission prosecutors who objected to the use of evidence obtained by torture and mistreatment also objected to the suppression of statements showing inconsistencies and the "systematic destruction of statements" that were exculpatory. App. 93.

The CMCR's reliance upon Petitioner's coerced statements violated both § 948r and due process. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981); *Mitchell v. United States*, 526 U.S. 314, 327 (1999). Irrespective of whether Petitioner's statement evidence should have been admitted trial, the law has changed. "That the trial court may not have ruled improperly when it admitted [Petitioner's] statement[s] into evidence in [2008] does not mean that the same evidence was necessarily admissible in [2022]." *Clabourne*, 745 F.3d at 380.

This Court therefore must reverse. And given the pervasiveness of this now inadmissible statement evidence in the record, this Court should further order resentencing on this basis alone. That is the only way the public can be confident that Petitioner's imprisonment is the result of Respondent meeting its burden to "produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle*, 451 U.S. at 462 (cleaned up).

38

### III.   THE CMCR ABUSED ITS DISCRETION IN DENYING RESENTENCING.

A panel of members sentenced Petitioner to life based upon his convictions for three charges taken together. This Court unanimously vacated Petitioner's convictions on two charges as *ex post facto* offenses, including the charge that prosecutors had made the "central charge" of Petitioner's case. App. 226. On review from its previous remand, this Court held that the CMCR had the same authority as regular military appellate courts under *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986), to "some circumstances revise sentences without remand." *Bahlul*, 967 F.3d at 866. But it also held that the CMCR had "failed to apply the correct harmless error standard." *Id*. at 863. Specifically, this Court held that the CMCR had failed to apply the beyond-a-reasonable-doubt standard that *Sales* itself held to govern when constitutional error potentially affected the accused's sentence. *Id*. at 865.

*Sales*, for its part, established a two-step inquiry to assess the harmlessness of an error on the sentence imposed. At the first step, the CMCR was required to find that the nature of the charges and the record permitted it to "reliably determine what sentence would have been imposed at the trial level if the error had not occurred." *Sales*, 22 M.J. at 307. Only then was it permitted to "not order a rehearing on sentence, but instead … itself reassess the sentence." *Ibid.* At the second step, it was required to find that "absent any error, the sentence adjudged

39

would have been of at least a certain severity." *Id*. at 308. And because the error in Petitioner's case was of constitutional magnitude, the CMCR had to make these findings beyond-a-reasonable-doubt pursuant to *Chapman*. *Ibid*.

The first step of the *Sales* inquiry – whether to dispense with resentencing – imposes a high bar because of the unfettered and unreviewable discretion that members exercise in the military justice system. *See United States v. Williams*, 77 M.J. 459, 464 (C.A.A.F. 2018) ("[A] panel's deliberations are inherently mysterious, and we are not in a position to know how members reach their decisions."). Like any defendant entitled to sentencing by jury, Petitioner had a statutory and a due process right to have the members' sentencing discretion exercised free from "misinformation of a constitutional magnitude" regarding the scope of his criminal liability. *United States v. Tucker*, 404 U.S. 443, 447 (1972) (vacating sentence where court considered three prior convictions, later held unconstitutional, in imposing maximum sentence); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

Hence, this Court and military courts routinely order resentencing when there is a chance that an unlawful conviction influenced a sentencing decision. *See*, *e.g.*, *United States v. Garcia Sota*, 948 F.3d 356, 363 (D.C. Cir. 2020); *United States v. Rhodes*, 106 F.3d 429, 433 (D.C. Cir. 1997); *United States v. Whren*, 53 F.3d 371, 376 (D.C. Cir. 1995); *United States v. Lyons*, 706 F.2d 321, 335 (D.C.

Cir. 1983); *United States v. Pinkney*, 551 F.2d 1241, 1246 n.37 (D.C. Cir. 1976);

*United States v. Moore*, 540 F.2d 1088, 1091 (D.C. Cir. 1976); *United States v.*

*Diggs*, 522 F.2d 1310, 1324 (D.C. Cir. 1975); *Bryant v. United States*, 417 F.2d

555, 558 (D.C. Cir. 1969); *United States v. Peoples*, 29 M.J. 426, 429 (C.M.A.

1990); *United States v. Voorhees*, 16 C.M.R. 83, 105 (C.M.A. 1954).

    *Sales* created a narrow exception to the need for resentencing in every case

in recognition of the fact that some court-martial offenses are so routinely

prosecuted that military appellate judges' "extensive experience with the level of

sentences imposed for such offenses under various circumstances" allows them to

reassess the impact of an error on a given sentence based upon the record alone.

*Moffeit*, 63 M.J. at 41. The first step of the *Sales* inquiry, in turn, was refined by

CAAF into the so-called *Winckelmann* factors, which guide a reviewing court in

determining whether the case under review is so routine that the effect of any error

on the sentencing process can be reliably isolated and corrected, if necessary, by

reducing the sentence to the level of harmlessness. *United States v. Winckelmann*,

73 M.J. 11, 15 (C.A.A.F. 2013). If not, then resentencing remains required.

## A.    The CMCR applied the wrong burden of proof.

    While the CMCR acknowledged the first step of *Sales* and at least nominally

proceeded through the *Winckelmann* factors, it again ignored the beyond-a-

reasonable-doubt standard. Instead, it held that it could dispense with resentencing

in favor of its own reassessment of the record based upon an amorphous inquiry into "appropriate[ness]." App. 17 ("We must determine whether it is *appropriate* to evaluate [Petitioner's] sentence without remanding to a military commission for a sentence rehearing."); *id.* at 20 ("The court thus determines that reassessment is *appropriate*, and that remand to the commission for a sentence rehearing is not required. We now proceed to reassess appellant's sentence."). But it failed, in its evaluation of the *Winckelmann* factors, to find that the record permitted it to "reliably determine what sentence would have been imposed at the trial level if the error had not occurred" beyond-a-reasonable-doubt. *Sales*, 22 M.J. at 307.

In short, the CMCR made the same error a second time. "The CMCR purported to rely on the standard articulated by the Court of Military Appeals in *Sales* but erred in the application of the standard." *Bahlul*, 967 F.3d at 867. And as before, this error constitutes an abuse of discretion. *Ibid.*

### B.    Given the state of the record, resentencing is required.

The CMCR also abused its discretion because nothing about the record in this case would permit this Court to be "confident" that the CMCR could "reliably determine what sentence would have been imposed at trial" on the inchoate conspiracy charge alone. *Buber*, 62 M.J. at 479 (cleaned up). Under military law, that inquiry is guided by the four so-called *Winckelmann* factors:

42

1) "Dramatic changes in the penalty landscape and exposure;"

2) Whether members imposed the sentence;

3) The dismissed charges influence on the record; and

4) The level of experience and familiarity judges have with type of offenses at issue.

*Winckelmann*, 73 M.J. at 15-16. None of these factors, taken alone or together, support the CMCR's conclusion that it could reliably determine (beyond-a-reasonable-doubt no less) what sentence the members would have imposed on Petitioner for conspiracy alone based on the record in this case.

**1.     Changes in the Penalty Landscape.** The CMCR held the need for resentencing was lessened because Petitioner's sentencing exposure remained the same today as it was in 2008. This was incorrect.

Petitioner's sentence is, in fact, more severe today than it was understood to be at the time of his trial. The sentence imposed by the members and approved by the Convening Authority was life, not life without parole. In 2009, Respondent itself insisted that Petitioner was "sentenced to life, not life *without parole*." *Bahlul v. United States*, No. 09-001, Appellee's Supplemental Brief, 3 (CMCR, Nov. 3, 2009) (original emphasis). Yet, despite these representations, Respondent subsequently disqualified Petitioner from the only parole system it afforded to detainees in Guantanamo. E.O. 13567, 76 Fed. Reg. 13277 § 1(a) (Mar. 7, 2011). As the CMCR itself recognized, Petitioner's sentence is and will remain life

43

without parole. App. 32. And for reasons not anticipated in 2008, Petitioner has been and will remain held in solitary confinement because of his status as a Low-Value Detainee. App. 153-156. Neither fact was presented to the members at sentencing, nor the Convening Authority.

The penalty landscape is also significantly different now because of the common-sense presumption that those convicted of multiple crimes deserve higher sentences than those convicted of a single offense. *See United States v. Gibson*, 11 M.J. 435, 437–38 (C.M.A. 1981). Prosecutors themselves highlighted the fact that Petitioner stood convicted on multiple charges in making their case for life imprisonment. App. 253-254; 257.

The CMCR, for its part, focused on the narrow fact that the maximum sentence for conspiracy remained life imprisonment. But to the extent this is relevant at all, *cf. United States v. Henry*, 472 F.3d 910, 916–17 (D.C. Cir. 2007), it amplifies, rather than militates against, the need for resentencing. Military commissions impose a single aggregate sentence that does not distinguish among predicate offenses and is set by the maximum sentence available on any single charge. RMC. 1002; 1003(b)(3). Here, that meant the members were instructed to impose a single sentence between no imprisonment and life for all three offenses collectively without any reference to – or awareness of – the maximum sentence for any one charge.

The CMCR nevertheless concluded that this factor favored its own unilateral reassessment on the strength of four lower military court cases that it erroneously claimed were "like" Petitioner's case. App. 18-19. None of these cases, however, involved constitutional error, and the majority were both unpublished and predated *Winckelmann*. And even if instructive, each involved the reassessment of sentences far below the maximum of life without parole.

     **2.**    **Member Sentencing.** The very purpose of the *Winckelmann* factors is to determine whether the aggregate sentence imposed for multiple charges might have been affected by the inclusion of charges that were later vacated. "Absent clairvoyance, we cannot actually know how a military judge or a panel of members would have sentenced an appellant following a change in factual circumstances. This is especially true within a sentencing construct not based on guidelines or bands, but on discretionary sentence maximums and individualized adjudication." *Moffeit*, 63 M.J. at 42 (Baker, J., concurring).

     Whether the accused was sentenced by a military judge or members is therefore the weightiest factor in determining whether resentencing is required. Where a statute vests a jury, rather than the judge, with the initial sentencing determination, a defendant has a due process right to the jury's exercise of that discretion. *Hicks*, 447 U.S. at 346; *Moffeit*, 63 M.J. at 43 (Baker, J. concurring); RMC 1006(d)(4)(b). If, however, the accused was sentenced by a military judge,

the imperative for resentencing is reduced because "[a]s a matter of logic, judges of the courts of criminal appeals are more likely to be certain of what a military judge would have done as opposed to members." *Winckelmann*, 73 M.J. at 16.

Yet, here, the CMCR inexplicably and without analysis held that this factor was of "limited relevance" because the MCA requires member sentencing in all cases. App. 19. But this inverts the very inquiry that *Sales* compelled the CMCR to undertake. Petitioner had the right to a three-quarters quorum of members to decide if he was to serve a sentence greater than ten years. RMC 1006(d)(4)(b). And the members were never afforded a chance to make a sentencing determination on the single offense of which Petitioner remains convicted.

In disregarding this factor and its implications for Petitioner's due process rights, the CMCR clearly abused its discretion. Reversal is therefore warranted on this basis alone. *Rita v. United States*, 551 U.S. 338, 358 (2007).

**3.      The Dismissed Charges' Influence on the Record.** The third factor asks whether "the nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses." *Winckelmann*, 73 M.J. at 16. Here, the prosecution's "central charge" of solicitation so pervaded the proceedings that imagining Petitioner's trial and sentencing without it requires a

leap of speculative imagination that necessarily fails the beyond-a-reasonable-doubt determination. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (a court cannot "hypothesize a [] verdict that was never in fact rendered").

A simple word-search of the record illustrates solicitation's centrality to the proceedings: the words "solicit/solicitation" and "propaganda/propagandist" collectively appeared seventy-nine times. By contrast, the words "conspire," "conspiracy," "agreement," "planning," "plot," "collude," "connive," and "scheme" combined appear only thirteen times outside of the military judge's reading of the charges.

At trial, prosecutors called four witnesses for the sole purpose of proving that the COLE Video was a criminal solicitation. None of this evidence was clearly admissible in the absence of the solicitation charge. *See* Military Commission Rules of Evidence ("MCRE") 401, 402, 403 (2007); *see also Chapman*, 386 U.S. at 23-24; *Fahy v. Connecticut*, 375 U.S. 85, 91 (1963).

The absence of the solicitation charge also rendered the prosecutors' whole sentencing case inadmissible. In military commission proceedings, aggravating evidence must be directly related to or result from the offense of conviction, which "imposes a higher standard than mere relevance." *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) (cleaned up). The only sentencing evidence was testimony from the commanding officer of the USS COLE and the father of a

crewmember who died. Petitioner had no involvement in the USS COLE attack, save for the prosecutor's contention that he "exploited the murder of those sailors, the wounding of the other sailors, to incite, inspire, to motivate, and to recruit other murderers." App. 255. Whatever indirect connection this highly emotional testimony might have had to the inchoate conspiracy offense, it was far too tenuous to satisfy the higher burden MCRE 1001(b)(2) and 403 impose.

The record is clear. Prosecutors implored the members to sentence Petitioner to life for making an "ongoing solicitation," conduct that this Court unanimously held was not criminal. App. 257. Respondent's "own statements made clear that it placed substantial weight on the allegations underlying the dismissed" charges, *United States v. Castillo-Torres*, 8 F.4th 68, 73 (1st Cir. 2021), and it used the solicitation charge to build the sentencing proceeding around inflammatory testimony that was unrelated – let alone directly attributable – to the single inchoate offense of which Petitioner remains convicted.

**4. Experience and Familiarity with the Charges.** The CMCR had to determine beyond-a-reasonable-doubt that "the remaining offenses are of the type that [it has] the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Winckelmann*, 73 M.J. at 16. No court, however, has any experience or familiarity with the remaining charge in this case precisely because Petitioner was the first defendant ever convicted of it.

48

In fact, the CMCR has little experience with military commission prosecutions generally, having only ever reviewed three cases on the merits. And the seven military commission prosecutions to reach the sentencing phase have varied so wildly in result that no one can reliably determine what sentence members might impose for one charge or another. For the three other cases involving only inchoate offenses like Petitioner's, sentences have spanned sixty-six months to fourteen years. For the three cases involving completed violent crimes, including murder, sentences have spanned thirteen to forty years.[7]

Recognizing that it could not rely on its own experience, as *Sales* directs, the CMCR looked to the terrorism enhancement under the Sentencing Guidelines. App. 22. But this was clear error. The heightened need for resentencing in the military context derives precisely from the fact that sentences "are not based on guidelines or bands, but on discretionary sentence maximums and individualized adjudication." *Moffeit*, 63 M.J. at 42 (Baker, J., concurring). And even if the analogy to federal sentencing practice was germane, the sentences imposed in federal terrorism cases vary widely in practice and fail to support the inevitability of life without parole.

---

[7] *The Guantanamo Docket*, N.Y. Times, https://nyti.ms/3Gc2RSf

The CMCR, for example, put great weight on the fact that "each of the eleven overt acts alleged in appellant's conspiracy were identical to the overt acts alleged in his material support offense." App. 19. But a study conducted by the Center on National Security concluded that the average sentence imposed on jihadists convicted of the §2339A variant of material support was 16.75-years, and slightly less for the §2339B variant that the CMCR analogized to Petitioner's conspiracy charge. Center on National Security, *By the Numbers: U.S. Prosecutions of Jihadist Terror Crimes, 2001-2013*.[8] A Justice Department study of terrorism convictions more generally showed that sentences vary widely in terrorism cases with life imposed in only 5% of cases. DOJ-NSD, Chart of Public/Unsealed Terrorism and Terrorism-Related Convictions, 9/11/01 – 12/31/2017 (Apr. 20, 2018).[9]

Conspiracy prosecutions are also exceptionally rare in the court-martial system. App. 164-71. And life sentences are rarer still, even for war crimes involving mass murder and torture. *See*, *e.g.*, *United States v. Calley*, 22 U.S.C.M.A. 534 (C.M.A. 1973); *United States v. Graner*, 69 M.J. 104, 105 (C.A.A.F. 2010).

---

[8] https://perma.cc/M5TR-DZYJ

[9] https://perma.cc/3CSM-8A3W

The CMCR held these contrary precedents irrelevant because they failed to show that Petitioner's sentence was inappropriately disparate. App. 24-27. But that was not the question. *See Sales*, 22 M.J. at 309. The only relevant question is whether the CMCR has such "extensive experience" with cases involving the conspiracy charge at issue here that it could "reliably determine what sentence would have been imposed at trial." *Buber*, 62 M.J. at 479 (cleaned up). The obvious answer is: No.

The CMCR, therefore, abused its discretion and common sense when it held that it could reliably reassess Petitioner's sentence based upon its speculations about the record. This Court should therefore reverse because resentencing is the only way to ensure beyond-a-reasonable-doubt that Petitioner is serving a sentence for the crime he stands convicted.

## IV.   EVEN ASSUMING THE CMCR COULD RELIABLY REASSESS PETITIONER'S SENTENCE FOR HARMLESSNESS, IT ABUSED ITS DISCRETION IN AFFIRMING.

In reassessing Petitioner's sentence, the CMCR relied on four overt acts underlying the conspiracy charge, which it claimed "underscore the seriousness of [Petitioner's] conduct" to such an extent that, taken together, the members would necessarily have sentenced Petitioner to life without parole on the conspiracy count alone. App. 22. These were: 1) Petitioner's swearing loyalty to Bin Laden; 2) his

assistance in editing the COLE Video; 3) his "arranging" for two of the 9/11 hijackers to pledge loyalty to Bin Laden; and 4) his "preparing" martyr wills for these two men. *Ibid.*

The CMCR put its heaviest emphasis on the latter two allegations and held that they showed Petitioner having "played a role" in the September 11th attacks. App. at 12-13, 15, 26. Because of them, it was "confident" that, though Petitioner had no foreknowledge of the September 11th attacks, he "suspected that Al Qaeda was planning to launch a suicide attack." App. 12 n.15. Consequently, it held the members would necessarily have sentenced Petitioner to life without parole.

The CMCR's sentencing reassessment constituted an abuse of discretion for three independently sufficient reasons to reverse. *First*, the CMCR established what it deemed the most incriminating facts against Petitioner with uncorroborated custodial statements, which are per se insufficient to establish any fact beyond-a-reasonable-doubt. *Second*, even taken at face value, the CMCR erred in inferring from these uncorroborated statements that Petitioner played any role in the September 11th attacks. *Third*, the CMCR's very need to reimagine how prosecutors could have tried Petitioner for conspiracy alone demonstrates that the constitutional errors that led to the vacatur of all but one of the charges against him were not harmless, let alone harmless beyond-a-reasonable-doubt.

### A. Uncorroborated custodial statements cannot establish any material fact beyond a reasonable doubt.

There is no reliable evidence substantiating Petitioner's alleged connection to the September 11th hijackers. The only ostensible evidence to support either allegation is Petitioner's involuntary and uncorroborated custodial statements and a vague and uncorroborated claim contained in a letter he gave to detention personnel in 2005. App. 12-13. Even assuming these statements said what the CMCR claimed they said, "[a]n uncorroborated confession does not as a matter of law establish beyond a reasonable doubt the commission of a crime." *Warszower v. United States*, 312 U.S. 342, 347–48 (1941); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999); *United States v. Beverly*, 34 C.M.R. 248, 252 (CMA 1964).

Even in habeas proceedings, where the corroboration rule does not apply because of the lower burden of proof, this Court has emphasized that "the court must take the absence of corroboration into account in assessing the reliability of the petitioner's out-of-court statements." *Alwi v. Obama*, 653 F.3d 11, 19 (D.C. Cir. 2011). The CMCR did not make any findings supporting these statements' reliability. Nor could it.

A principal reason the Supreme Court has reaffirmed corroboration requirements in criminal prosecutions is that "Confessions may be unreliable because they are coerced or induced." *Smith v. United States*, 348 U.S. 147, 153

53

(1954). This Court has noted that the corroboration requirement developed in substantial part because of the doubts surrounding custodial interrogations that are not *Mirandized*. *Dickerson*, 163 F.3d at 642 n.2. And for the reasons given in § II *supra*, the involuntariness of Petitioner's statements is independently sufficient to render them unreliable, if not inadmissible outright.

The CMCR could not, therefore, make any inculpatory findings beyond-a-reasonable-doubt that were predicated solely upon evidence that this Court and the Supreme Court have held for nearly a century is not reliable to that standard.

### B. The CMCR drew erroneous inferences from the record.

The CMCR also misunderstood the record. "Because a sentence must 'not be based on improper or inaccurate information,'" *United States v. Kpodi*, 824 F.3d 122, 126 (D.C. Cir. 2016) (cleaned up), this Court must "determine whether the lower court relied on clearly erroneous facts in reaching the ultimate sentence." *Ibid*. This applies to the "inferences drawn from findings of fact as well as to the findings themselves." *Ibid*.

There is no evidence, let alone reliable evidence, proving that Petitioner had any material connections to two of the September 11th hijackers. The only testimony respecting his interactions with these two men came from interrogators, who testified that Petitioner had recognized their photos during interrogations, that he had admitted to their briefly "staying in the same location" as he did in

54

Afghanistan, App. 240, and that he had seen them "in Kandahar near the airport prior to returning to Yemen." App. 244.

The most seemingly serious of the allegations, that Petitioner "helped prepared martyr wills" for these two men, relies upon a mischaracterization of the evidence. Proof of this allegation is founded exclusively upon a letter Petitioner ostensibly provided to detention personnel in 2005. App. 172. Even assuming this letter, taken alone, was sufficient to prove any fact beyond-a-reasonable-doubt, it does not say that Petitioner "helped prepare martyr wills." The translation in the record says that Petitioner "typed their martyr wills on a computer." App. 176. The Arabic word used in the original letter is "طبع", meaning "print" or, "Transferring the content of something to paper with a typewriter or printer."[10]

At trial, the only witness to testify respecting the content of this letter paraphrased the relevant passage as, "He facilitated the bayat for them and also their will. He printed it on the computer." App. 237. The only testimony respecting the timing of when Petitioner printed out these documents is from another interrogator, who said Petitioner learned who the two hijackers were "*after* 9/11 and participating with compiling the martyrdom will." App. 244 (emphasis added).

---

[10] https://translate.google.com/?sl=ar&tl=en&text=%D8%B7%D8%A8%D8%B9

In short, the CMCR's most damning findings – the two allegations on which it put the most weight in concluding that the members could not have sentenced Petitioner to anything but life without parole – depended upon clearly erroneous inferences drawn from unreliable evidence. Just as in *Kpodi*, where this Court vacated and remanded because the improper consideration of a "chilling" incident that predated the appellant's convicted offense, 824 F.3d at 129, the CMCR's erroneous conclusion that the record "implicitly" established that Petitioner had an role in the most notorious terrorist attack in this nation's history was an abuse of discretion. *Sealed Case*, 552 F.3d at 848.

## C. The CMCR abused its discretion by reimagining the record to justify a sentence on legal theories not presented to the members.

Finally, even in the light most favorable to the CMCR, its elevation of these particular facts to show that the members "*implicitly* found that [Petitioner] participated in the underlying offense," *Sealed Case*, 552 F.3d at 847 (original emphasis), is precisely the kind of speculative, judgment-substituting analysis that *Chapman* forbids. And even crediting the CMCR's denunciation of the crime of conspiracy as "especially grievous," and "of the gravest character." App. 22-23, that is not an argument prosecutors ever made to the members.

Here, not one but two unconstitutional convictions directly contributed to Petitioner's life sentence. The members were instructed that they were duty-bound

to impose a sentence that punished Petitioner for solicitation, material support, and conspiracy collectively. App. 251. And prosecutors exhorted the members that Petitioner deserved life imprisonment based upon his solicitation conviction, in particular. These unconstitutional convictions were not mere aggravating factors the members could consider in reaching a sentence for conspiracy—they were the predicate offenses for the sentence itself.

The CMCR erred as a matter of law in reaffirming a sentence of life without parole by speculating a theory of the case never presented to the members. *See United States v. Bennitt*, 74 M.J. 125, 128 (C.A.A.F. 2015); *United States v. Miller*, 67 M.J. 385, 388 (C.A.A.F. 2009). Its need to do so demonstrates that the errors here were not harmless to any standard. And it shows the CMCR's abused its discretion in reaffirming a sentence of life without parole against what prosecutors called a "Little Fish," App. 116, whose "most immediate role was as the personal secretary of Usama bin Laden," App. 220, on a single inchoate conspiracy charge.

"Where the appellate court could only speculate as to what sentence the trial court would have imposed absent consideration of a count upon which the conviction or sentence is later vacated, a remand for resentencing on the remaining, valid counts is appropriate." *Pinkney*, 551 F.2d at 1246 n.37; *see also United States v. Boone*, 49 M.J. 187, 197–98 (C.A.A.F. 1998); *United States v. Gleason*, 43 M.J. 69, 76 (C.A.A.F. 1995).

## CONCLUSION

For the foregoing reasons, Petitioner asks that his conviction be vacated under *Arthrex*. In the alternative, he asks this Court to remand for resentencing because life without parole cannot be legally justified based on the existing record in this case.

Respectfully submitted,

 /s/    Michel Paradis
Michel Paradis
LT Jennifer Joseph, JAGC, USN
Aaron Shepard
Military Commission Defense Organization
1620 Defense Pentagon
Washington, DC 20301-1620
michel.d.paradis.civ@mail.mil
1.703.695.4672

MAJ Todd E. Pierce, JA, USA (Ret.)
Univ. of Minnesota Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitations imposed by Fed. R. App. P. 32(a)(7)(B) because:

[X] this brief contains 12,765 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: November 14, 2022

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: November 14, 2022

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

## ADDENDUM OF RELEVANT CONSTITUTIONAL, STATUTORY & REGULATORY PROVISIONS

### CONSTITUTIONAL PROVISIONS

**U.S. Const. Art. II § 2, cl. 2 states:**

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

**U.S. Const., amend. 5 states:**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

# STATUTES

**10 U.S.C. § 821 states:**

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 822 states:**

(a) General courts-martial may be convened by—

> (1) the President of the United States;

> (2) the Secretary of Defense;

> (3) the commanding officer of a unified or specified combatant command;

> (4) the Secretary concerned;

> (5) the commanding officer of an Army Group, an Army, an Army Corps, a division, a separate brigade, or a corresponding unit of the Army or Marine Corps;

> (6) the commander of a fleet; the commanding officer of a naval station or larger shore activity of the Navy beyond the United States;

> (7) the commanding officer of an air command, an air force, an air division, or a separate wing of the Air Force or Marine Corps;

> (8) any other commanding officer designated by the Secretary concerned; or

> (9) any other commanding officer in any of the armed forces when empowered by the President.

(b) If any such commanding officer is an accuser, the court shall be convened by superior competent authority, and may in any case be convened by such authority if considered desirable by him.

**10 U.S.C. § 873 states:**

At any time within three years after the date of the entry of judgment under section 860c of this title (article 60c), the accused may petition the Judge Advocate General for a new trial on the grounds of newly discovered evidence or fraud on the court. If the accused's case is pending before a Court of Criminal Appeals or

A-2

before the Court of Appeals for the Armed Forces, the Judge Advocate General shall refer the petition to the appropriate court for action. Otherwise the Judge Advocate General shall act upon the petition.

**10 U.S.C. § 948h (2006/2009) states:**

Military commissions under this chapter may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose.

**10 U.S.C. § 948i(b) (2006) states:**

*Detail of Members*.—When convening a military commission under this chapter, the convening authority shall detail as members of the commission such members of the armed forces eligible under subsection (a), as in the opinion of the convening authority, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a military commission when such member is the accuser or a witness for the prosecution or has acted as an investigator or counsel in the same case.

**10 U.S.C. § 948i(c) (2006) states:**

*Excuse of Members*.— Before a military commission under this chapter is assembled for the trial of a case, the convening authority may excuse a member from participating in the case.

**10 U.S.C. § 948m(b) (2006) states:**

*Excuse of Members*.— No member of a military commission under this chapter may be absent or excused after the military commission has been assembled for the trial of a case unless excused—
(1) as a result of challenge;
(2) by the military judge for physical disability or other good cause; or
(3) by order of the convening authority for good cause.

**10 U.S.C. § 948m(c) states:**

*Absent and Additional Members*.— Whenever a military commission under this chapter is reduced below the number of members required by subsection (a), the trial may not proceed unless the convening authority details new members sufficient to provide not less than such number. The trial may proceed with the new members

present after the recorded evidence previously introduced before the members has been read to the military commission in the presence of the military judge, the accused (except as provided in section 949d of this title), and counsel for both sides.

**10 U.S.C. § 948r (2006) states:**

(a) *In General*. No person shall be required to testify against himself at a proceeding of a military commission under this chapter.

(b) *Exclusion of Statements Obtained by Torture*. A statement obtained by use of torture shall not be admissible in a military commission under this chapter, except against a person accused of torture as evidence that the statement was made.

(c) *Statements Obtained Before Enactment of Detainee Treatment Act of 2005*. A statement obtained before December 30, 2005 (the date of the enactment of the Defense Treatment Act of 2005) in which the degree of coercion is disputed may be admitted only if the military judge finds that–

    (1) the totality of the circumstances renders the statement reliable and possessing sufficient probative value; and

    (2) the interests of justice would best be served by admission of the statement into evidence.

(d) *Statements Obtained After Enactment of Detainee Treatment Act of 2005*. A statement obtained on or after December 30, 2005 (the date of the enactment of the Defense Treatment Act of 2005) in which the degree of coercion is disputed may be admitted only if the military judge finds that–

    (1) the totality of the circumstances renders the statement reliable and possessing sufficient probative value;

    (2) the interests of justice would best be served by admission of the statement into evidence; and

    (3) the interrogation methods used to obtain the statement do not amount to cruel, inhuman, or degrading treatment prohibited by section 1003 of the Detainee Treatment Act of 2005.

**10 U.S.C. § 948r (2009) states:**

*Exclusion of statements obtained by torture or cruel, inhuman, or degrading treatment; prohibition of self-incrimination; admission of other statements of the accused*

(a) *Exclusion of Statements Obtain by Torture or Cruel, Inhuman, or Degrading Treatment.*—No statement obtained by the use of torture or by cruel, inhuman, or degrading treatment (as defined by section 1003 of the Detainee Treatment Act of 2005 (42 U.S.C. 2000dd)), whether or not under color of law, shall be admissible

in a military commission under this chapter, except against a person accused of torture or such treatment as evidence that the statement was made.

(b) *Self-incrimination Prohibited*.—No person shall be required to testify against himself or herself at a proceeding of a military commission under this chapter.

(c) *Other Statements of the Accused*.—A statement of the accused may be admitted in evidence in a military commission under this chapter only if the military judge finds—

> (1) that the totality of the circumstances renders the statement reliable and possessing sufficient probative value; and
>
> (2) that—
>
>> (A) the statement was made incident to lawful conduct during military operations at the point of capture or during closely related active combat engagement, and the interests of justice would best be served by admission of the statement into evidence; or
>>
>> (B) the statement was voluntarily given.

(d) *Determination of Voluntariness*.—In determining for purposes of subsection (c)(2)(B) whether a statement was voluntarily given, the military judge shall consider the totality of the circumstances, including, as appropriate, the following:

> (1) The details of the taking of the statement, accounting for the circumstances of the conduct of military and intelligence operations during hostilities.
>
> (2) The characteristics of the accused, such as military training, age, and education level.
>
> (3) The lapse of time, change of place, or change in identity of the questioners between the statement sought to be admitted and any prior questioning of the accused.

## 10 U.S.C. § 949b(a)(2)(B) (2006) states, in relevant part:

No person may attempt to coerce or, by any unauthorized means, influence—

(A) the action of a military commission under this chapter, or any member thereof, in reaching the findings or sentence in any case;

(B) the action of any convening, approving, or reviewing authority with respect to his judicial acts; or

(C) the exercise of professional judgment by trial counsel or defense counsel.

## 10 U.S.C. § 949m(c)(2) (2006) states:

In any case described in paragraph (1) in which 12 members are not reasonably available because of physical conditions or military exigencies, the convening

authority shall specify a lesser number of members for the military commission (but not fewer than 9 members), and the military commission may be assembled, and the trial held, with not fewer than the number of members so specified. In such a case, the convening authority shall make a detailed written statement, to be appended to the record, stating why a greater number of members were not reasonably available.

**10 U.S.C. § 949b (2006) states:**

(a) *Notice to Convening Authority of Findings and Sentence*.—The findings and sentence of a military commission under this chapter shall be reported in writing promptly to the convening authority after the announcement of the sentence.

(b) Submittal of Matters by Accused to Convening Authority.—

> (1) The accused may submit to the convening authority matters for consideration by the convening authority with respect to the findings and the sentence of the military commission under this chapter.
>
> (2)    (A) Except as provided in subparagraph (B), a submittal under paragraph (1) shall be made in writing within 20 days after the accused has been given an authenticated record of trial under section 949o(c) of this title.
>
> (B) If the accused shows that additional time is required for the accused to make a submittal under paragraph (1), the convening authority may, for good cause, extend the applicable period under subparagraph (A) for not more than an additional 20 days.
>
> (3) The accused may waive his right to make a submittal to the convening authority under paragraph (1). Such a waiver shall be made in writing and may not be revoked. For the purposes of subsection (c)(2), the time within which the accused may make a submittal under this subsection shall be deemed to have expired upon the submittal of a waiver under this paragraph to the convening authority.

(c) *Action by Convening Authority*.—

> (1) The authority under this subsection to modify the findings and sentence of a military commission under this chapter is a matter of the sole discretion and prerogative of the convening authority.
>
> (2)    (A) The convening authority shall take action on the sentence of a military commission under this chapter.
>
> (B) Subject to regulations prescribed by the Secretary of Defense, action on the sentence under this paragraph may be taken only after consideration of any matters submitted by the accused under subsection

(b) or after the time for submitting such matters expires, whichever is earlier.

(C) In taking action under this paragraph, the convening authority may, in his sole discretion, approve, disapprove, commute, or suspend the sentence in whole or in part. The convening authority may not increase a sentence beyond that which is found by the military commission.

(3) The convening authority is not required to take action on the findings of a military commission under this chapter. If the convening authority takes action on the findings, the convening authority may, in his sole discretion, may—

(A) dismiss any charge or specification by setting aside a finding of guilty thereto; or

(B) change a finding of guilty to a charge to a finding of guilty to an offense that is a lesser included offense of the offense stated in the charge.

(4) The convening authority shall serve on the accused or on defense counsel notice of any action taken by the convening authority under this subsection.

(d) *Order of Revision or Rehearing.*—

(1) Subject to paragraphs (2) and (3), the convening authority of a military commission under this chapter may, in his sole discretion, order a proceeding in revision or a rehearing.

(2)    (A) Except as provided in subparagraph (B), a proceeding in revision may be ordered by the convening authority if—

(i) there is an apparent error or omission in the record; or

(ii) the record shows improper or inconsistent action by the military commission with respect to the findings or sentence that can be rectified without material prejudice to the substantial rights of the accused.

(B) In no case may a proceeding in revision—

(i) reconsider a finding of not guilty of a specification or a ruling which amounts to a finding of not guilty;

(ii) reconsider a finding of not guilty of any charge, unless there has been a finding of guilty under a specification laid under that charge, which sufficiently alleges a violation; or

(iii) increase the severity of the sentence unless the sentence prescribed for the offense is mandatory.

(3) A rehearing may be ordered by the convening authority if the convening authority disapproves the findings and sentence and states the reasons for

A-7

disapproval of the findings. If the convening authority disapproves the finding and sentence and does not order a rehearing, the convening authority shall dismiss the charges. A rehearing as to the findings may not be ordered by the convening authority when there is a lack of sufficient evidence in the record to support the findings. A rehearing as to the sentence may be ordered by the convening authority if the convening authority disapproves the sentence.

## 10 U.S.C. § 950c(a) (2006/2009) states:

*Automatic Referral for Appellate Review.*—Except as provided under subsection (b), in each case in which the final decision of a military commission (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the Court of Military Commission Review. Any such referral shall be made in accordance with procedures prescribed under regulations of the Secretary.

## 10 U.S.C. § 950f(c) (2006) states:

*Cases to be Reviewed.*—The Court of Military Commission Review, in accordance with procedures prescribed under regulations of the Secretary, shall review the record in each case that is referred to the Court by the convening authority under section 950c of this title with respect to any matter of law raised by the accused.

## 10 U.S.C. § 950f(c) (2009) states:

*Cases to be Reviewed.*— The Court shall, in accordance with procedures prescribed under regulations of the Secretary, review the record in each case that is referred to the Court by the convening authority under section 950c of this title with respect to any matter properly raised by the accused.

## 10 U.S.C. § 950f(d) (2009) states:

In a case reviewed by the Court under this section, the Court may act only with respect to the findings and sentence as approved by the convening authority. The Court may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

**10 U.S.C. § 950g(a) (2009) states:**

Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review) under this chapter.

**10 U.S.C. § 950g(d) (2009) states:**

*Scope and Nature of Review*. — The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

**10 U.S.C. § 950i(d) (2006/2009) states:**

*Suspension of Sentence*. — The Secretary of the Defense, or the convening authority acting on the case (if other than the Secretary), may suspend the execution of any sentence or part thereof in the case, except a sentence of death.

**10 U.S.C. § 950j(a) (2006) states:**

*Finality*. The appellate review of records of trial provided by this chapter, and the proceedings, findings, and sentences of military commissions as approved, reviewed, or affirmed as required by this chapter, are final and conclusive. Orders publishing the proceedings of military commissions under this chapter are binding upon all departments, courts, agencies, and officers of the United States, except as otherwise provided by the President.

**10 U.S.C. § 950j (2009) states:**

*Finality of proceedings, findings, and sentences*. The appellate review of records of trial provided by this chapter, and the proceedings, findings, and sentences of military commissions as approved, reviewed, or affirmed as required by this chapter, are final and conclusive. Orders publishing the proceedings of military commissions under this chapter are binding upon all departments, courts, agencies, and officers of the United States, subject only to action by the Secretary or the convening authority as provided in section 950i(c) of this title and the authority of the President.

**Military Commissions Act of 2009, 123 Stat. 2190 § 1804(a) states:**

*Prior Convictions*.—The amendment made by section 1802 shall have no effect on the validity of any conviction pursuant to chapter 47A of title 10, United States Code (as such chapter was in effect on the day before the date of the enactment of this Act).

**Military Commissions Act of 2009, 123 Stat. 2190 § 1804(d)(1) states:**

*In General*.—Except as provided in subsections (a) through (c) and subject to paragraph (2), any commission convened pursuant to chapter 47A of title 10, United States Code (as such chapter was in effect on the day before the date of the enactment of this Act), shall be conducted after the date of the enactment of this Act in accordance with the procedures and requirements of chapter 47A of title 10, United States Code (as amended by section 1802).

# REGULATION FOR TRIAL BY MILITARY COMMISSION

**Regulation for Trial by Military Commission § 1-3(b) (2007) states:**

The Chief Trial Judge, Military Commissions Trial Judiciary, as designee of the convening authority, is responsible for the supervision and administration of the Military Commissions Trial Judiciary.

**Regulation for Trial by Military Commission § 1-5 (b) (2007) states:**

Those who fail to adhere to the rules, procedures, regulations, and instructions applicable to trials by military commission may be subject to appropriate action by the Secretary of Defense or his designee, the Convening Authority for Military Commissions, or the military judge of a military commission.

**Regulation for Trial by Military Commission § 2-1 (2007) states:**

The Office of the Convening Authority for Military Commissions is established in the Office of the Secretary of Defense under the authority, direction, and control of the Secretary of Defense. The Office of the Convening Authority shall consist of the Director of the Office of the Convening Authority, the convening authority, the legal advisor to the convening authority, and such other subordinate officials and organizational elements as are within the resources of the Secretary of Defense.

**Regulation for Trial by Military Commission § 2-2 (2007) states:**

Pursuant to 10 U.S.C. § 948h, the Secretary of Defense or any officer or official of the United States designated by the Secretary for that purpose may convene military commissions. No specific form or order is designated as required to effect the appointment of one or more convening authorities by the Secretary of Defense.

**Regulation for Trial by Military Commission § 2-1 (2007) states:**

The Office of the Convening Authority for Military Commissions is established in the Office of the Secretary of Defense under the authority, direction, and control of the Secretary of Defense. The Office of the Convening Authority shall consist of the Director of the Office of the Convening Authority, the convening authority, the legal advisor to the convening authority, and such other subordinate officials and organizational elements as are within the resources of the Secretary of Defense.

**Regulation for Trial by Military Commission § 2-2 (2007) states:**

Pursuant to 10 U.S.C. § 948h, the Secretary of Defense or any officer or official of the United States designated by the Secretary for that purpose may convene military commissions. No specific form or order is designated as required to effect the appointment of one or more convening authorities by the Secretary of Defense.

**Regulation for Trial by Military Commission § 2-3 (2007) states:**

a. In performing duties directly related to military commissions, the convening authority shall:

> 1. dispose of charges forwarded to the convening authority by the trial counsel through the legal advisor, by either referring any or all charges to a military commission, returning them to trial counsel with directions for further action, or dismissing them;
>
> 2. issue orders convening one or more military commissions to try alien unlawful enemy combatants for violations of the law of war or other crimes triable by military commissions;
>
> 3. detail as military commission members and alternate members those commissioned officers who are, in the opinion of the convening authority, best qualified for duty by reason of age, education, training, experience, length of service, and judicial temperament;
>
> 4. detail or employ qualified court reporters to make verbatim records of all commission sessions;
>
> 5. detail or employ qualified interpreters who shall interpret for the commissions and, as necessary, for the accused;
>
> 6. appoint all other personnel necessary to facilitate military commissions;
>
> 7. approve or disapprove requests from the prosecution to communicate with news media representatives regarding military commission cases and other matters related to military commissions;
>
> 8. approve or disapprove plea agreements with an accused;
>
> 9. order that such investigative or other resources be made available to defense counsel and the accused as deemed necessary by the convening authority for a fair trial;
>
> 10. employ those experts requested by a party and found by the convening authority to be relevant and necessary;
>
> 11. be responsible for effecting preparation of the record of trial;
>
> 12. consider matters submitted by an accused with respect to the findings and sentence prior to taking action on the case;

13. take such action on the findings and sentence deemed by the convening authority appropriate;

14. forward the case (as approved by the convening authority) to the Court of Military Commission Review; and

15. perform such other functions as the Secretary of Defense or an appellate court may prescribe.

b. In the performance of assigned functions and responsibilities, the convening authority for military commissions shall:

1. report directly to the Secretary of Defense or his designee;

2. use existing facilities and services of the Department of Defense and other federal agencies, whenever practicable, to avoid duplication and to achieve an appropriate level of efficiency and economy;

3. communicate directly with the heads of other DOD components as necessary to carry out assigned functions. Communications to the military departments shall be transmitted through the Secretaries of the military departments, their designees, or as otherwise provided by law or directed by the Secretary of Defense. Communications to the Commanders of the Combatant Commands, except in unusual circumstances, shall be transmitted through the Chairman of the Joint Chiefs of Staff; and

4. communicate with other Government officials, representatives of the legislative branch, members of the public, and representatives of foreign governments, as applicable, in carrying out assigned functions.

## Regulation for Trial by Military Commission § 4-1 (2007) states:

a. The Secretary of Defense or a convening authority designated by the Secretary of Defense may order charges against an accused be tried by a specified military commission.

b. The convening authority will personally determine whether to refer the charges to trial by military commission and to the type of military commission (capital or non-capital) to which charges will be referred. This function may not be delegated.

## Regulation for Trial by Military Commission § 4-3(a) (2007) states:

The convening authority refers cases by personal order and may include instructions regarding the disposition of the charges and how they are to be tried. The convening authority may refer cases to a non-capital commission even if the offenses referred are capital offenses. If a case is referred to a capital commission, the offenses referred must be capital offenses and the convening authority must indicate on the referral with a special instruction that the case is to be tried as capital (see R.M.C. 201(d))

**Regulation for Trial by Military Commission § 4-3(c) (2007) states:**

In a case where the death penalty is authorized, and the convening authority decides to refer the case as non-capital, the referral should include special instructions stating the case is referred as non-capital.

1. Instructions. The convening authority may include instructions in his referral order that:

    A. charges against an accused be tried with other charges previously referred;

    B. charges against one accused be referred for joint or common trial with another accused; and

    C. capital offenses be referred as non-capital offenses (see R.M.C. 601(e)).

**Regulation for Trial by Military Commission § 4-3(h) (2007) states:**

If the convening authority is unable to refer the case to trial, forward the case to the Secretary of Defense for further action. If the Secretary of Defense cannot take action in a particular case, the Secretary of Defense should designate an official to serve as the convening authority for a particular case.

**Regulation for Trial by Military Commission § 5-2(h) (2007) states:**

a. Pursuant to 10 U.S.C. § 948i(b) the convening authority shall detail as members of the commission such commissioned officers who are on active duty and who in the opinion of the convening authority are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a military commission when such member is the accuser or a witness for the prosecution or has acted as an investigator or counsel in the same case (see R.M.C. 502(a)).

b. The convening authority may excuse a member from participating in a case before a military commission is assembled for trial (see 10 U.S.C. § 948i(c)).

c. After assembly of the court, the convening authority may excuse a member for good cause (see 10 U.S.C. § 948m(b)(3)).

**Regulation for Trial by Military Commission § 5-3 (2007) states:**

a. Convening orders. A convening order is used to announce the detail of a military commission. A military commission is created by a convening order of the convening authority (see R.M.C. 504(a)). The convening authority for a military commission shall detail the members and designate where the military commission will meet. If the convening authority has been designated by the Secretary of Defense, the convening order will so state (see R.M.C. 504(d)).

b. The convening authority will issue convening orders for each military commission as soon as practicable after he or she personally determines the members of a military commission. Oral convening orders will be confirmed by written orders as soon as practicable. Convening orders may be amended.

c. A list of the individuals, organizations, and installations to which copies of the order will be sent and the number of copies to be furnished will be indicated under "DISTRIBUTION." Distribution includes one copy for the reference set, when needed, and the record set of the military publications.

## Regulation for Trial by Military Commission § 6-1(b) (2007) states:

The Military Commissions Trial Judiciary will consist of military judges nominated by The Judge Advocates General from the military departments. The Chief Trial Judge will be selected from that pool of military judges by the convening authority.

## Regulation for Trial by Military Commission § 7-4 (2007) states:

The convening authority may detail a security officer to advise a military commission on matters related to classified and protected information. In addition to any other duties assigned by the convening authority, the security officer shall ensure that all classified or protected evidence and information is appropriately safeguarded at all times and that only personnel with the appropriate clearances and authorizations are present when classified or protected evidence are presented before military commissions.

## Regulation for Trial by Military Commission § 7-7 (2007) states:

Reporters, interpreters, security personnel, and clerical assistants may be detailed from either military or civilian personnel serving under the convening authority or, in the case of reporters and interpreters, through a commercial provider. When necessary, the convening authority may employ or authorize the employment of a reporter or interpreter, at the prevailing wage scale, for duty with a military commission or at the taking of a deposition. No expense to the Government shall be incurred by the employment of a reporter, interpreter, or other person to assist in a military commission or the taking of a deposition, except when authorized by the convening authority.

## Regulation for Trial by Military Commission § 8-4(d)(3) (2007) states:

The trial counsel shall, as directed by the military judge or the convening authority, prepare any documentation necessary to facilitate the conduct of military commissions proceedings.

A-15

**Regulation for Trial by Military Commission § 8-4(d)(5) (2007) states:**

Trial counsel shall perform all other functions, consistent with the M.C.A. and M.M.C., as may be directed by the convening authority or the military judge.

**Regulation for Trial by Military Commission § 8-6(b)(1) (2007) states:**

The Chief Prosecutor shall report to the legal advisor to the convening authority.

**Regulation for Trial by Military Commission § 8-6(b)(4) (2007) states:**

All other military commission personnel, such as court reporters, interpreters, security personnel, bailiffs and clerks detailed or employed by the convening authority, if not assigned to the Office of the Chief Defense Counsel or Chief Prosecutor, shall report to the convening authority or her designee.

**Regulation for Trial by Military Commission § 8-7 (2007) states:**

The Assistant Secretary of Defense for Public Affairs shall serve as the sole release authority for Department of Defense information and audiovisual materials regarding military commissions. Personnel assigned to the Office of the Chief Prosecutor may communicate with news media representatives regarding cases and other matters related to military commissions only when approved by the convening authority.

**Regulation for Trial by Military Commission § 9-1(a)(4) (2007) states:**

The Chief Defense Counsel shall detail a judge advocate of any United States armed force, who is assigned to or performing duty with, the Office of the Chief Defense Counsel, to perform the duties of the detailed defense counsel as set forth in R.M.C. 502(d)(6). The Chief Defense Counsel shall also detail or employ any other personnel as approved by the convening authority. The Chief Defense Counsel may not detail himself to perform the duties of detailed defense counsel.

**Regulation for Trial by Military Commission § 10-1(b) (2007) states:**

Failure, by any individual, including military or civilian counsel, to adhere to the rules, procedures, regulations, and instructions applicable to trials by military commission may result in action by the Secretary of Defense or his designee, convening authority, or the military judge of a military commission. Such action may include permanently barring an individual from participating in any military commission proceeding convened pursuant to the M.C.A., punitive measures imposed under R.M.C. 809, and any other lawful sanction.

A-16

**Regulation for Trial by Military Commission § 12-1 (2007) states:**

Unless such authority is withheld by a superior competent authority, convening authority is authorized to enter into or reject offers to enter into Pretrial Agreements (PTAs) with the accused. The decision to accept or reject a PTA offer submitted by an accused is within the sole discretion of the convening authority who referred the case to trial.

**Regulation for Trial by Military Commission § 13-1 (2007) states:**

The funding for all witness travel approved by the convening authority related to trials by military commission will be arranged by the Office of Military Commissions.

**Regulation for Trial by Military Commission § 13-7(b) (2007) states:**

Only the convening authority may authorize the employment of an expert witness at government expense. Such authorization shall be in writing and shall fix the limit of compensation to be paid such expert based on the normal compensation paid by United States attorneys for attendance of a witness of such standing in the United States courts in the area involved. The expert witness fee prescribed by the convening authority however, will be paid in lieu of the ordinary attendance fee only on those days the witness is required to attend the court at government expense.

**Regulation for Trial by Military Commission § 14-2 (2007) states:**

A request for a deposition may be made by either party. A deposition may be ordered after the charges are sworn. The convening authority, who has the charges for disposition, or, after referral, the military judge, may order a deposition taken upon request of a party pursuant to R.M.C. 702. The parties may also agree to take a deposition without cost to the United States. Requests to the convening authority should be forwarded through the convening authority's legal advisor.

**Regulation for Trial by Military Commission § 15-1(b)(1) (2007) states:**

The military commissions convening authority may grant immunity to any persons subject to the M.C.A. However, the convening authority may grant immunity to a person subject to the M.C.A. extending to a prosecution in a United States District Court only when specifically authorized to do so by the Attorney General of the United States or other authority designated under 18 U.S.C. § 6004.

**Regulation for Trial by Military Commission § 17-3(a) (2007) states:**

A protective order may be sought by either party at any time counsel believes information must be protected or limited in its disclosure. Protective orders are governed by R.M.C. 701-703 and Mil. Comm. R. Evid. 505 and 506. Any military judge, or if prior to referral of charges, the convening authority, may issue a Protective Order.

**Regulation for Trial by Military Commission § 23-7 (2007) states:**

The convening authority shall follow the provisions of R.M.C. 1105(a) and 1107 in taking action on post-trial matters. The convening authority may, in her sole discretion, approve, disapprove, commute, or suspend the sentence in whole or in part. The convening authority may not increase a sentence beyond that which is found by the military commission.

**Regulation for Trial by Military Commission § 26-4(b) (2007) states:**

*Final orders*. The convening authority shall issue final orders in cases that:

> 1. Are returned from the appellate courts for action in accordance with the decision of the court.
> 2. Implement the decision of the President to approve or to commute the sentence of death adjudged by the military commission.
> 3. The accused waives appellate review.

**Regulation for Trial by Military Commission § 27-2(a) (2007) states:**

*Proceeding in revision*. Up to the point of action, only the convening authority may order the convening of a proceeding in revision. Such proceedings may be convened to correct errors, omissions, or inconsistencies arising during or after trial, provided that such correction can be affected without material prejudice to the accused.

**Regulation for Trial by Military Commission § 27-2(b) (2007) states:**

*Post-trial R.M.C. 803 session*. Either the convening authority or the military judge may order a post-trial R.M.C. 803 session for the purpose of: (1) inquiring into or resolving a matter arising after trial that substantially affects the legal sufficiency of any finding of guilty or the sentence; or (2) reconsidering any ruling by the military judge that substantially affects the legal sufficiency of any finding of guilty or the sentence. An R.M.C. 803 session may not be called for the purpose of inquiring into any matter arising after trial or any reconsidering any ruling of the military judge, if the inquiry or reconsideration pertains to any finding of not guilty. A request by either

party for a posttrial R.M.C. 803 session may be directed to the convening authority or the military judge, or both. Either the convening authority or military judge may order such session sua sponte. If a post-trial R.M.C. 803 session is ordered, the official directing the session will ensure that counsel and the accused are notified as soon as practicable. Trial counsel will seek expeditious scheduling of the session with the military judge.

**Regulation for Trial by Military Commission § 27-3(c) (2007) states:**

Although the convening authority is not required to take action on the findings or to review the case for factual sufficiency or legal errors prior to taking action under R.M.C. 1107, the convening authority may, in his or her sole discretion, order a rehearing of any offense for which a finding of guilty was entered, unless the convening authority also determines that there is insufficient evidence in the record to support a finding of guilty on the offense charged or any lesser included offense. Pursuant to R.M.C. 1107, the convening authority may also order a rehearing as to any lesser-included offense of any offense for which a finding of guilty was entered at trial, so long as the convening authority does not also find that the record contains insufficient evidence to support that lesser included offense. In determining whether the evidence is sufficient to support a rehearing of findings under R.M.C. 1107, the convening authority may consider substitute evidence for evidence the convening authority determines should not have been admissible at trial. If, after a rehearing under this paragraph, any finding of guilty remains, the convening authority may direct a rehearing as to sentence or may approve a sentence of no punishment.

**Regulation for Trial by Military Commission § 27-3(d) (2007) states:**

In acting on the sentence in any case under R.M.C. 1107, the convening authority may elect to approve all or part of the sentence, approve a sentence of a lesser type, direct a rehearing as to sentence, or approve a sentence of no punishment.

**Regulation for Trial by Military Commission § 27-4(a) (2007) states:**

Within two years after the convening authority has approved the sentence in a military commission case, the accused may petition the convening authority for a new trial on the grounds of:

> 1. Newly discovered evidence (except as to any specification for which a guilty plea was accepted by the military judge); or
> 2. Fraud on the commission.

A-19

## MANUAL FOR MILITARY COMMISSIONS

**Rule for Military Commission 103(8) (2007) states:**

"Convening authority" means the Secretary of Defense or any officer or official of the United States designated by the Secretary of Defense for that purpose.

**Rule for Military Commission 104(a)(2) (2007) states:**

No person may attempt to coerce or, by any unauthorized means, influence the action of a military commission or any member thereof, in reaching the findings or sentence in any case or the action of any convening, approving, or reviewing authority with respect to such authority's judicial acts or the exercise of profession judgment by trial counsel or defense counsel.

**Rule for Military Commission 201(b)(3)(A) (2007) states:**

*Requisites for military commission jurisdiction.* … The military commission must be convened by an official empowered to convene it.

**Rule for Military Commission 407 (2007) states:**

(a) *Disposition*. When in receipt of charges, the convening authority may:

> (1) Dismiss any charges;
> (2) Dismiss any specification;
> (3) Subject to R.M.C. 601(d), refer any or all charges to a military commission.

(b) National security matters. When in receipt of charges the trial of which the convening authority finds would probably be inimical to the prosecution of a war or harmful to national security, that convening authority, unless otherwise prescribed by regulations of the Secretary of Defense, and after appropriate consultation with the Office of the Director of National Intelligence, shall determine whether trial is warranted and, if so, whether the security considerations involved are paramount to a trial. As the convening authority finds appropriate, he may dismiss the charges, or authorize trial of them.

**Rule for Military Commission 501(b) (2007) states:**

Counsel in a military commission. Military trial and defense counsel shall be detailed to military commissions by the Chief Prosecutor and Chief Defense Counsel, respectively. Assistant trial and associate or assistant defense counsel may also be detailed. Civilian trial counsel may be detailed by the Chief Prosecutor, with

A-20

the approval of the convening authority and, if such counsel are employed by another government agency, with the approval of the head of that agency. Should an accused, pursuant to his request, be deemed competent to represent himself, detailed defense counsel shall serve as standby counsel.

**Rule for Military Commission 502(a)(1) (2007) states:**

The members detailed to a military commission shall be those active duty commissioned officers, who in the opinion of the convening authority are best qualified for the duty by reason of their age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a military commission when such member is the accuser or a witness for the prosecution or has acted as an investigator or counsel in the same case.

**Rule for Military Commission 503(a) (2007) states:**

The convening authority shall detail active duty commissioned officers as members and alternate members for trials by military commission. Each of the military departments shall nominate officers in the number and grades requested by the convening authority, who meet the qualifications of 10 U.S.C. § 825 (Article 25 of the Code). The convening authority shall select from the lists of available officers those who are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.

**Rule for Military Commission 503(b)(2) (2007) states:**

The Convening Authority shall select a military judge from the pool described in subsection (1) to serve as the Chief Judge of the Military Commissions Trial Judiciary. The Chief Trial Judge shall have extensive experience as a military judge certified to be qualified for duty as a military judge in general courts-martial and shall be currently appointed in the grade of colonel or captain. If the officer selected is not currently serving on active duty, but consents to the selection, he or she shall be ordered to active duty for this purpose, in accordance with applicable service regulations, for a period not to exceed three years.

**Rule for Military Commission 504(a) (2007) states:**

A military commission is created by a convening order of the convening authority.

**Rule for Military Commission 504(b) (2007) states:**

A military commission may be convened by the Secretary of Defense or persons occupying positions designated as a convening authority by the Secretary of Defense. The power to convene military commissions may not be delegated.

**Rule for Military Commission 504(e) (2007) states:**

The convening authority shall ensure that an appropriate location and facilities for military commissions are provided.

**Rule for Military Commission 505(c) (2007) states:**

Changes of members.

(1) *Before assembly.* Before the military commission is assembled, the convening authority may change the members of the military commission without showing cause.

(2) *After assembly*. After assembly no member may be excused, except:

      (A) By the convening authority for good cause shown on the record;

      (B) By the military judge for good cause shown on the record; or

      (C) As a result of challenge.

(3) *New members*. New members may be detailed after assembly only when, as a result of excusals under subsection (c)(2) of this rule, the number of members of the commission is reduced below a quorum.

**Rule for Military Commission 601(a) (2007) states:**

Referral is the order of a convening authority that charges against an accused will be tried by a specified military commission.

*Discussion*. Referral of charges requires three elements: a convening authority who is authorized to convene the military commission and is not disqualified (see R.M.C. 601(b) and (c)); sworn charges that have been received by the convening authority for disposition (see R.M.C. 307); and a military commission convened by that convening authority or a predecessor. If trial would be warranted but would be detrimental to the prosecution of a war or inimical to national security, see R.M.C. 407(b).

**Rule for Military Commission 601(b) (2007) states:**

*Who may refer*. The Secretary of Defense or a designated convening authority may refer charges to a military commission.

**Rule for Military Commission 601(e)(2) (2007) states:**

How charges shall be referred.

(1) Order, instructions. Referral shall be by the personal order of the convening authority. The convening authority may include proper instructions in the order.

*Discussion*. Referral is ordinarily evidenced by an indorsement to the charging document. The signature may be that of a person acting by the order or direction of the convening authority. In such a case, the signature element must reflect the signer's authority. The convening authority may instruct that the charges against the accused be tried with certain other charges against the accused. (See subsection (2) below.) The convening authority may instruct that charges against one accused be referred for joint or common trial with another accused. (See subsection (3) below.) Capital offenses may be referred as non-capital. Any special instructions must be stated in the referral indorsement. When the charges have been referred to a military commission, the indorsed charge sheet and allied papers should be promptly transmitted to the trial counsel.

(2) *Joinder of offenses*. In the discretion of the convening authority, two or more offenses charged against an accused may be referred to the same military commission for trial, whether serious or minor offenses or both, regardless whether related. Additional charges may be joined with other charges for a single trial at any time before arraignment if all necessary procedural requirements concerning additional charges have been complied with. After arraignment of the accused upon charges, no additional charges may be referred to the same trial without consent of the accused.

(3) *Joinder of accused*. Allegations against two or more accused may be referred for joint trial if the accused are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such accused may be charged in one or more specifications together or separately, and every accused need not be charged in each specification. Related allegations against two or more accused which may be proved by substantially the same evidence may be referred to a common trial.

*Discussion.* A joint offense is one committed by two or more persons acting together with a common intent. Joint offenses may be referred for joint trial, along with all related offenses against each of the accused. A common trial may be used when the evidence of several offenses committed by several accused separately is essentially the same, even though the offenses were not jointly committed. A joint offense is one committed by two or more persons acting together with a common intent. Offenders are properly joined only if there is a common unlawful design or purpose.

A-23

Convening authorities should consider that joint and common trials may be complicated by procedural and evidentiary rules.

**Rule for Military Commission 604 (2007) states:**

(a) *Withdrawal*. The convening authority may for any reason cause any charges or specifications to be withdrawn from a military commission at any time before findings are announced.

*Discussion.* Charges which are withdrawn from a military commission should be dismissed (see R.M.C. 401(b)), unless it is intended to refer them anew promptly or to forward them to another authority for disposition. Charges should not be withdrawn from a military commission arbitrarily or unfairly to an accused. (See also section (b) of this rule.) Some or all charges and specifications may be withdrawn. In a joint or common trial the withdrawal may be limited to charges against one or some of the accused. Charges which have been properly referred to a military commission may be withdrawn only by the direction of the convening authority or a superior competent authority in the exercise of that officer's independent judgment. When directed to do so by convening authority or a superior competent authority, trial counsel may withdraw charges or specifications by lining out the affected charges or specifications, renumbering remaining charges or specifications as necessary, and initialing the changes. Charges and specifications withdrawn before commencement of trial will not be brought to the attention of the members. When charges or specifications are withdrawn after they have come to the attention of the members, the military judge must instruct them that the withdrawn charges or specifications may not be considered for any reason.

(b) *Referral of withdrawn charges.* Charges which have been withdrawn from a military commission may be referred to another military commission unless the withdrawal was for an improper reason. Charges withdrawn after the introduction of evidence on the general issue of guilt may be referred to another military commission only if the withdrawal was necessitated by urgent and unforeseen military necessity.

*Discussion.* See also R.M.C. 915 (Mistrial). When charges which have been withdrawn from a military commission are referred to another military commission, the reasons for the withdrawal and later referral should be included in the record of the later military commission, if the later referral is more onerous to the accused. Therefore, if further prosecution is contemplated at the time of the withdrawal, the reasons for the withdrawal should be included in or attached to the record of the earlier proceeding. Improper reasons for withdrawal include an intent to interfere with the free exercise by the accused of any rights to which he may be entitled, or with the impartiality of a military commission. A withdrawal is improper if it was not directed personally and independently by the convening authority or by a

A-24

superior competent authority. Whether the reason for a withdrawal is proper, for purposes of the propriety of a later referral, depends in part on the stage in the proceedings at which the withdrawal takes place. Before arraignment, there are many reasons for a withdrawal which will not preclude another referral. These include receipt of additional charges, absence of the accused, reconsideration by the convening authority or by a superior competent authority of the seriousness of the offenses, questions concerning the mental capacity of the accused, and routine duty rotation of the personnel constituting the military commission. Charges withdrawn after arraignment may be referred to another military commission under some circumstances. For example, it is permissible to refer charges which were withdrawn pursuant to a pretrial agreement if the accused fails to fulfill the terms of the agreement (see R.M.C. 705). Charges withdrawn after some evidence on the general issue of guilty is introduced may be re-referred only under the narrow circumstances described in the rule.

**Rule for Military Commission 702(b) (2007) states:**

A convening authority who has the charges for disposition or, after referral the military judge may order that a deposition be taken on request of a party.

**Rule for Military Commission 703(d) (2007) states:**

*Employment of expert witnesses*. When the employment at Government expense of an expert is considered necessary by a party, the party shall, in advance of employment of the expert, and with notice to the opposing party, submit a request to the convening authority to authorize the employment and to fix the compensation for the expert. The request shall include a complete statement of reasons why employment of the expert is necessary and the estimated cost of employment. A request denied by the convening authority may be renewed before the military judge, who shall determine whether the testimony of the expert is relevant and necessary, and, if so, whether the Government has provided or will provide an adequate substitute. If the military judge grants a motion for employment of an expert or finds that the Government is required to provide a substitute, the proceedings shall be abated if the Government fails to comply with the ruling. In the absence of advance authorization, an expert witness may not be paid fees other than those to which entitled under paragraph (e)(2)(D) of this rule.

**Rule for Military Commission 703(e)(2)(G)(i) (2007) states:**

The military judge or, if there is no military judge, the convening authority may, in accordance with this rule, issue a warrant of attachment to compel the attendance of a witness or production of documents.

**Rule for Military Commission 704(c)(1) (2007) states:**

The military commission convening authority may grant immunity to any person subject to the M.C.A. However, the convening authority may grant immunity to a person subject to the M.C.A. extending to a prosecution in a United States District Court only when specifically authorized to do so by the Attorney General of the United States or other authority designated under 18 U.S.C. § 6004.

**Rule for Military Commission 705(a) (2007) states:**

Subject to such limitations as the Secretary may prescribe, an accused and the convening authority may enter into a pretrial agreement in accordance with this rule. All of the terms of the agreement must be contained in the agreement and must be in writing.

*Discussion.* The authority of convening authorities to refer cases to trial and approve pretrial agreements extends only to trials by military commission. To ensure that such actions do not preclude appropriate action by Federal civilian authorities in cases likely to be prosecuted in the United States district courts, convening authorities shall ensure that appropriate consultation under the "Memorandum of Understanding Between the Departments of Justice and Defense Relating to the Investigation and Prosecution of Crimes Over Which the Two Departments Have Concurrent Jurisdiction " (see Manual for Courts-Martial app. 3) has taken place prior to trial by military commission or approval of a pretrial agreement in cases where such consultation is required.

**Rule for Military Commission 705(d)(3) (2007) states:**

The convening authority may either accept or reject an offer of the accused to enter into a pretrial agreement or may propose by counteroffer any terms or conditions not prohibited by law or public policy. The decision whether to accept or reject an offer is within the sole discretion of the convening authority. When the convening authority has accepted a pretrial agreement, the agreement shall be signed by the convening authority or by a person, such as the legal advisor, who has been authorized by the convening authority to sign.

*Discussion.* The convening authority should consult with the legal advisor before acting on an offer to enter into a pretrial agreement.

A-26

**Rule for Military Commission 706(b) (2007) states:**

(1) *Before referral*. Before referral of charges, an inquiry into the mental capacity or mental responsibility of the accused may be ordered by the convening authority before whom the charges are pending for disposition.

(2) *After referral*. After referral of charges, an inquiry into the mental capacity or mental responsibility of the accused may be ordered by the military judge. The convening authority may order such an inquiry after referral of charges but before beginning of the first session of the military commission (including any R.M.C. 803 session) when the military judge is not reasonably available. The military judge may order a mental examination of the accused regardless of any earlier determination by the convening authority.

**Rule for Military Commission 809(d) (2007) states:**

A record of the contempt proceedings shall be part of the record of the trial of the military commission during which it occurred. If the person was held in contempt, then a separate record of the contempt proceedings shall be prepared and forwarded to the convening authority for review. The convening authority may approve or disapprove all or part of the sentence. The action of the convening authority is not subject to further review or appeal.

**Rule for Military Commission 809(e) (2007) states:**

A sentence of confinement pursuant to a finding of contempt shall begin to run when it is adjudged unless deferred, suspended, or disapproved by the convening authority. The place of confinement for a civilian or military person who is held in contempt and is to be punished by confinement shall be designated by the convening authority. A fine does not become effective until ordered executed by the convening authority. The military judge may delay announcing the sentence after a finding of contempt to permit the person involved to continue to participate in the proceedings.

**Rule for Military Commission 810(a)(4) (2007) states:**

[Rehearings] may be ordered in the sole discretion of the convening authority.

**Rule for Military Commission 905(j) (2007) states:**

Except as otherwise provided in this Manual, any matters which may be resolved upon motion without trial of the general issue of guilt may be submitted by a party to the convening authority before trial for decision. Submission of such matter to the convening authority is not, except as otherwise provided in this Manual, required,

A-27

and is, in any event, without prejudice to the renewal of the issue by timely motion before the military judge.

**Rule for Military Commission 1001(b)(2) (2007) states:**

*Evidence in aggravation.* The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused. In addition, evidence in aggravation may include evidence that the accused intentionally selected any victim or any property as the object of the offense because of the actual or perceived race, gender, color, religion, national origin, ethnicity, disability, or sexual orientation of any person or that any offense of which the accused has been convicted comprises a violation of the law of war.

**Rule for Military Commission 1009(d) (2007) states:**

When a sentence adjudged by the military commission is ambiguous, the convening authority may return the matter to the military commission for clarification. When a sentence adjudged by the military commission is apparently illegal, the convening authority may return the matter to the military commission for reconsideration or may approve a sentence no more severe than the legal, unambiguous portions of the adjudged sentence.

**Rule for Military Commission 1101(c)(2)(A) (2007) states:**

The convening authority [may defer the execution of the sentence], if at the time of deferment the accused is subject to the military commission jurisdiction of the convening authority

**Rule for Military Commission 1102(a) (2007) states:**

Post-trial sessions may be proceedings in revision or R.M.C. 803 sessions. Such sessions may be directed by the military judge or the convening authority in accordance with this rule.

**Rule for Military Commission 1107 (2007) states:**

(a) *Who may take action*. The convening authority shall take action on the sentence and, in the discretion of the convening authority, the findings, unless it is impracticable. If it is impracticable for the convening authority to act, the convening

A-28

authority shall, forward the case to an official designated by the Secretary of Defense for action under this rule.

(b) General considerations.

(1) *Discretion of convening authority*. The action to be taken on the findings and sentence is within the sole discretion of the convening authority. Determining what action to take on the findings and sentence of a military commission is a matter of prerogative. The convening authority is not required to review the case for legal errors or for factual sufficiency.

(2) When action may be taken. The convening authority may take action only after the applicable time periods under R.M.C. 1105(b) have expired or the accused has waived the right to present matters under R.M.C. 1105(d), whichever is earlier, subject to regulations of the Secretary concerned.

(3) Matters considered.

(A) *Required matters*. Before taking action, the convening authority shall consider:

(i) The result of trial;

(ii) The recommendation of the legal advisor under R.M.C. 1106, if applicable; and

(iii) Any matters submitted by the accused under R.M.C. 1105 or, if applicable, R.M.C. 1106(e).

(B) *Additional matters*. Before taking action the convening authority may consider:

(i) The record of trial;

(ii) Any relevant records pertaining to the accused; and

(iii) Such other matters as the convening authority deems appropriate.

However, if the convening authority considers matters adverse to the accused from outside the record, with knowledge of which the accused is not chargeable, the accused shall be notified and given an opportunity to rebut.

(4) When proceedings resulted in finding of not guilty or not guilty only by reason of lack of mental responsibility, or there was a ruling amounting to a finding of not guilty. The convening authority shall not take action disapproving a finding of not guilty, a finding of not guilty only by reason of lack of mental responsibility, or a ruling amounting to a finding of not guilty. When an accused is found not guilty only by reason of lack of mental responsibility, the convening authority, however, may commit the accused to a suitable facility or otherwise make provisions for appropriate treatment of

the accused, pending a hearing and disposition in accordance with R.M.C. 1102A.

(5) *Action when accused lacks mental capacity*. The convening authority may not approve a sentence while the accused lacks mental capacity to understand and to conduct or cooperate intelligently in the post-trial proceedings. In the absence of substantial evidence to the contrary, the accused is presumed to have the capacity to understand and to conduct or cooperate intelligently in the post-trial proceedings. If a substantial question is raised as to the requisite mental capacity of the accused, the convening authority may direct an examination of the accused in accordance with R.M.C. 706 before deciding whether the accused lacks mental capacity, but the examination may be limited to determining the accused's present capacity to understand and cooperate in the post-trial proceedings. The convening authority may approve the sentence unless it is established, by a preponderance of the evidence—including matters outside the record of trial—that the accused does not have the requisite mental capacity. Nothing in this subsection shall prohibit the convening authority from disapproving the findings of guilty and sentence.

(c) *Action on findings*. Action on the findings is not required. However, the convening authority may, in the convening authority's sole discretion:

(1) Change a finding of guilty to a charge or specification to a finding of guilty to an offense that is a lesser included offense of the offense stated in the charge or specification; or

(2) Set aside any finding of guilty and—

(A) Dismiss the specification and, if appropriate, the charge, or

(B) Direct a rehearing in accordance with section (e) of this rule.

*Discussion*. The convening authority may for any reason or no reason disapprove a finding of guilty or approve a finding of guilty only of a lesser offense. However, see section (e) of this rule if a rehearing is ordered. The convening authority is not required to review the findings for legal or factual sufficiency and is not required to explain a decision to order or not to order a rehearing, except as provided in section (e) of this rule. The power to order a rehearing, or to take other corrective action on the findings, is designed solely to provide an expeditious means to correct errors that are identified in the course of exercising discretion under the rule.

(d) Action on the sentence.

(1) *In general*. The convening authority may for any or no reason disapprove a legal sentence in whole or in part, mitigate the sentence, and change a punishment to one of a different nature as long as the severity of the punishment is not increased. The convening or higher authority may not

increase the punishment imposed by a military commission. The approval or disapproval shall be explicitly stated.

(2) *Determining what sentence should be approved*. The convening authority shall approve that sentence which is warranted by the circumstances of the offense and appropriate for the accused. When the military commission has adjudged a punishment pursuant to a pretrial agreement, the convening authority may nevertheless approve a lesser sentence.

(3) Deferring service of a sentence to confinement.

(A) In a case in which a military commission sentences an accused referred to in paragraph (B), below, to confinement, the convening authority may defer service of a sentence to confinement by a military commission, without the consent of the accused, until after the accused has been permanently released to U.S. custody by a foreign country.

(B) Paragraph (A) applies to an accused who, while in custody of a foreign country, is temporarily returned by that foreign country to the U.S. for trial by military commission; and after the military commission is returned to that, or another, foreign country under the authority of a mutual agreement or treaty, as the case may be.

(e) Ordering rehearing.

(1) *In general*. The convening authority may in the convening authority's discretion order a rehearing. A rehearing may be ordered as to some or all offenses of which findings of guilty were entered and the sentence, or as to sentence only.

(2) *Limitation: Lack of sufficient evidence*. A rehearing may not be ordered as to findings of guilty when there is a lack of sufficient evidence in the record to support the findings of guilty of the offense charged or of any lesser included offense. A rehearing may be ordered, however, if the proof of guilt consisted of inadmissible evidence for which there is available an admissible substitute. A rehearing may be ordered as to any lesser offense included in an offense of which the accused was found guilty, provided there is sufficient evidence in the record to support the lesser included offense.

(3) *Rehearing on sentence only*. A rehearing on sentence only shall be referred to the same type of military commission that made the original findings, provided however that the convening authority may elect to refer to a noncapital military commission the rehearing on sentence only of a case previously tried before a capital military commission. This latter referral precludes death as an authorized punishment. If the convening authority determines a rehearing on sentence is impracticable, the convening authority may approve a sentence of no punishment without conducting a rehearing.

(f) Contents of action and related matters.

(1) *In general*. The convening authority shall state in writing and insert in the record of trial the convening authority's decision as to the sentence, whether any findings of guilty are disapproved, and orders as to further disposition. The action shall be signed personally by the convening authority.

(2) *Modification of initial action*. The convening authority may recall and modify any action taken by that convening authority at any time before it has been published or before the accused has been officially notified.

(3) *Findings of guilty*. If any findings of guilty are disapproved, the action shall so state. If a rehearing is not ordered, the affected charges and specifications shall be dismissed by the convening authority in the action. If a rehearing or other trial is directed, the reasons for the disapproval shall be set forth in the action.

(4) Action on sentence.

(A) *In general*. The action shall state whether the sentence adjudged by the military commission is approved. If only part of the sentence is approved, the action shall state which parts are approved. A rehearing may not be directed if any sentence is approved.

(B) *Execution; suspension*. The action shall indicate, when appropriate, whether an approved sentence is to be executed or whether the execution of all or any part of the sentence is to be suspended. No reasons need be stated.

(C) *Place of confinement*. If the convening authority orders a sentence of confinement into execution, the convening authority shall designate the place of confinement in the action, unless otherwise prescribed by the Secretary of Defense or the Attorney General of the United States.

(5) Action on rehearing or new or other trial.

(A) *Rehearing or other trial*. In acting on a rehearing or other trial the convening authority shall be subject to the sentence limitations prescribed in R.M.C. 810(d). Except when a rehearing or other trial is combined with a trial on additional offenses and except as otherwise provided in R.M.C. 810(d), if any part of the original sentence was suspended and the suspension was not properly vacated before the order directing the rehearing, the convening authority shall take the necessary suspension action to prevent an increase in the same type of punishment as was previously suspended. The convening authority may approve a sentence adjudged upon a rehearing or other trial regardless whether any kind or amount of the punishment adjudged at the former trial has been served or executed. However, in computing the term or amount of

punishment to be actually served or executed under the new sentence, the accused shall be credited with any kind or amount of the former sentence included within the new sentence that was served or executed before the time it was disapproved or set aside. The convening authority shall, if any part of a sentence adjudged upon a rehearing or other trial is approved, direct in the action that any part or amount of the former sentence served or executed between the date it was adjudged and the date it was disapproved or set aside shall be credited to the accused. If, in the action on the record of a rehearing, the convening authority disapproves the findings of guilty of all charges and specifications which were tried at the former hearing and that part of the sentence which was based on these findings, the convening authority shall, unless a further rehearing is ordered, provide in the action that all rights, privileges, and property affected by any executed portion of the sentence adjudged at the former hearing shall be restored. The convening authority shall take the same restorative action if a military commission at a rehearing acquits the accused of all charges and specifications which were tried at the former hearing.

(B) *New trial*. The action of the convening authority on a new trial shall, insofar as practicable, conform to the rules prescribed for rehearings and other trials in paragraph (f)(5)(A) of this rule.

(g) *Incomplete, ambiguous, or erroneous action*. When the action of the convening or of a higher authority is incomplete, ambiguous, or contains clerical error, the authority who took the incomplete, ambiguous, or erroneous action may be instructed by superior authority to withdraw the original action and substitute a corrected action.

(h) *Service on accused*. A copy of the convening authority's action shall be served on the accused or on defense counsel. If the action is served on defense counsel, defense counsel shall, by expeditious means, provide the accused with a copy.

**Rule for Military Commission 1108(b) (2007) states:**

*Who may suspend and remit*. The convening authority may, after approving the sentence, suspend the execution of all or any part of the sentence of a military commission, except for a sentence of death. The Secretary of Defense may suspend or remit any part or amount of the unexecuted part of any sentence other than a sentence approved by the President or a sentence of confinement for life that has been ordered executed.

**Rule for Military Commission 1210(a) (2007) states:**

At any time within two years after approval by the convening authority of a military commission sentence, the accused may petition the convening authority for a new trial on the ground of newly discovered evidence or fraud on the military commission. A petition may not be submitted after the death of the accused. A petition for a new trial of the facts may not be submitted on the basis of newly discovered evidence when the accused was found guilty of the relevant offense pursuant to a guilty plea.

**Rule for Military Commission 1210(e) (2007) states:**

The convening authority may consider and grant a petition for new trial, in his discretion. If the convening authority declines to consider or grant a petition for new trial, he shall refer the petition to the Court of Military Commission Review for action.

**Military Commission Rule of Evidence 401 (2007) states:**

Evidence has "probative value to a reasonable person" when a reasonable person would regard the evidence as making the existence of any fact that is of consequence to a determination of the commission action more probable or less probable than it would be without the evidence.

**Military Commission Rule of Evidence 402 (2007) states:**

All evidence having probative value to a reasonable person is admissible, except as otherwise provided by these rules, this Manual, or any Act of Congress applicable to trials by military commissions. Evidence that does not have probative value to a reasonable person is not admissible.

**Military Commission Rule of Evidence 403 (2007) states:**

The military judge shall exclude any evidence the probative value of which is substantially outweighed: (1) by the danger of unfair prejudice, confusion of the issues, or misleading the commission; or (2) by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**Military Commission Rule of Evidence 506(f) (2007) states:**

After referral of charges, if the defense moves for disclosure of government information for which a claim of privilege has been made under this rule, the matter shall be reported to the convening authority. The convening authority may:

(1) institute action to obtain the information for use by the military judge in making a determination under section (i);

(2) dismiss the charges;

(3) dismiss the charges or specifications or both to which the information relates; or

(4) take other action as may be required in the interests of justice. If, after a reasonable period of time, the information is not provided to the military judge, the military judge shall dismiss the charges or specifications or both to which the information relates.